**E-Filed 12/29/08**

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| William Michael DENNIS,<br><br>                         Petitioner,<br><br>                         v.<br><br>Robert L. AYERS Jr., Warden of San Quentin State Prison,<br><br>                         Respondent. | Case Number 5-98-cv-21027-JF<br><br>DEATH-PENALTY CASE<br><br>ORDER GRANTING IN PART AND DENYING IN PART RESPONDENT'S SECOND MOTION FOR SUMMARY JUDGMENT<br><br>[Doc. No. 214] |

      In a prior order in the above-captioned capital habeas action, the Court granted in part and denied in part Respondent's motion for summary judgment on record-based claims. (Doc. No. 117.) Now ripe for decision is Respondent's second motion for summary judgment, whereby Respondent moves for summary judgment on all remaining claims. (Doc. No. 214.)

      In its prior order, the Court discussed the background of the present action as well as the relevant standards for determining a motion for summary judgment in a capital habeas matter. (Doc. No. 117 at 2–6; *id*. at 9–11.) That discussion will not be repeated here except to the extent that it is directly relevant to resolving the claims addressed herein. However, the Court notes that the factual determinations made by the Supreme Court of California in its opinion disposing of Petitioner's direct appeal, *People v. Dennis*, 950 P.2d 1035 (Cal. 1998), are "presumed to be correct." 28 U.S.C. § 2254(e)(1). Moreover, the state court's factual determinations in that

1  opinion are confirmed in all material respects by this Court's independent review of the record,
2  which also forms the basis for this Court's own factual determinations.  *Cf. Earp v. Ornoski*, 431
3  F.3d 1158, 1165 n.3 (9th Cir. 2005).

## I.  CLAIM 1

The Sixth Amendment guarantees that "In all criminal prosecutions, the accused shall enjoy the right to . . . a trial, by an impartial jury. . . ."  U.S. Const. amend. VI.  This right is incorporated into the Fourteenth Amendment, which ensures fair trials for criminal defendants with its provision that "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."  U.S. Const. amend. XIV § 1; *see Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.").  In Claim 1, Petitioner alleges that he was deprived of his federal constitutional rights to a fair trial and an impartial jury by the trial court's denial of his motion for a change of venue.  The Supreme Court of California denied this claim on the merits in its opinion disposing of Petitioner's direct appeal.  950 P.2d at 1066–67.

Petitioner moved for a change of venue from Santa Clara County based on the extensive countywide publicity in the print media and on radio and television regarding the killing of Doreen Erbert and her fetus[1] on October 31, 1984, and the unusual circumstances surrounding Petitioner's arrest shortly thereafter.  In the weeks and months following the crimes, the media reported inflammatory and highly prejudicial information and speculation regarding both the crime and Petitioner.  *Id.* at 1066.

In the storied *Sheppard* case, the Supreme Court of the United States held that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."  384 U.S. at 363.  A "barrage of inflammatory publicity immediately

---

[1] Under California penal law, the terms "fetus" and "human being" are precise terms with distinct legal meanings.  *See, e.g.*, Cal. Penal Code § 187(a) ("Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.").  The Court uses the term "fetus" in the present order (rather than, for example, "baby," "child," or "human being") because Petitioner killed a fetus within the meaning of California law.  *See* 950 P.2d at 1056–57.

1   prior to trial amounting to a huge wave of public passion" may establish such a likelihood.
2   *Patton v. Yount*, 467 U.S. 1025, 1033 (1984) (internal quotation marks and citations omitted).
3       However, in the present action, this Court's independent review of the record confirms
4   the conclusion of the Supreme Court of California that "[t]he record does not support a
5   conclusion that [Petitioner] could not have had or did not have a fair trial in Santa Clara County."
6   950 P.2d at 1067. This is so because "there was little publicity during the [more than three] years
7   that followed [the crime] before the case came to trial in 1988," *id.* at 1066, "[t]he size of Santa
8   Clara County's population suggests that any prejudicial publicity's effect would be diluted or
9   neutralized over time," and "the passage of time appears to have had the expected effect in this
10  instance," *id.* at 1077, as demonstrated by the record of voir dire, including Petitioner's failure to
11  exhaust his peremptory challenges, *see id.* (correctly describing record of voir dire). As in *Yount*,
12  the "lapse in time had a profound effect on the community and, more important, on the jury, in
13  softening or effacing opinion," 467 U.S. at 1033, for "time soothes and erases," *id.* at 1034: the
14  majority of prospective jurors had not heard of the case or had vague recollections of it; all of the
15  seated jurors had not heard of the case or knew no specifics and all had heard nothing about it in
16  the preceding three years, 950 P.2d at 1067.
17      The Supreme Court of California correctly determined that the trial court's denial of
18  Petitioner's motion for a change of venue did not deprive him of his right to an impartial jury.
19  The state court's determination having been correct, Respondent is entitled to summary judgment
20  as to Claim 1.
21              II. CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL
22      One component of the Fourteenth Amendment's guarantee that a person may not be
23  deprived of life or liberty "without due process of law," U.S. Const. amend. XIV § 1, is the Sixth
24  Amendment's provision of a criminal defendant's right "to have the Assistance of Counsel for
25  his defence," U.S. Const. amend. VI. *Gideon v. Wainwright*, 372 U.S. 335 (1963). "It has long
26  been recognized that the right to counsel is the right to the effective assistance of counsel."
27  *McMann v. Richardson*, 397 U.S. 759 (1970). Petitioner claims that he was deprived of the
28  effective assistance of counsel when his counsel: did not attempt to rehabilitate certain

3

prospective jurors during voir dire (Claim 2); failed to investigate and enter a plea of not guilty by reason of insanity (Claim 3); abandoned him and labored under an actual conflict of interest (Claim 5); failed to present compelling evidence of mental disease (Claims 11 and 17); and performed inadequately at the penalty phase of his trial (Claim 18).

To obtain relief on a claim of ineffective assistance of counsel, Petitioner must satisfy the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, with performance measured against an objective standard of reasonableness under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal citations and quotation marks omitted). Counsel's performance must be assessed "from counsel's perspective at the time," so as "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"; hence "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* Further, with respect to the issue of investigative strategy,

> Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91. To establish prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Respondent contends that relief on a number of Petitioner's ineffective-assistance claims is barred by *Teague v. Lane*, 489 U.S. 288 (1989), which held that new constitutional rules of criminal procedure generally are not retroactively applicable on collateral review. (*See, e.g.*, Doc. No. 214 at 29.) However, these are straightforward claims of ineffective assistance of counsel that are governed by the familiar rule set forth in *Strickland*. A grant of relief on any of

these claims would not create a new rule; accordingly, none of these claims is *Teague*-barred. *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003).

### A.  CLAIM 2

In Claim 2, Petitioner contends that trial counsel provided ineffective assistance by his failure to make any effort to rehabilitate prospective jurors who initially indicated a general opposition to the death penalty.  The Supreme Court of California addressed this claim in its opinion regarding Petitioner's automatic appeal.  In a section captioned "Failure to Rehabilitate Prospective Jurors," the state court considered Petitioner's argument that "his counsel was ineffective for not attempting to rehabilitate six jurors who were excused for their opposition to the death penalty."  In resolving this claim, the state court found that "[d]uring voir dire, these prospective jurors made clear their opposition to the death penalty," and the court's "own review of the voir dire of these prospective jurors provides absolutely no indication their views on the death penalty were malleable."  Accordingly, any attempt by trial counsel to rehabilitate these prospective jurors would have been "futile."  950 P.2d at 1082.

Petitioner believes that the Court must appoint an investigator, a *Strickland* expert, and an expert in jury selection and voir dire before this claim may be resolved.  (Doc. No. 233 at 25.)  However, this Court's independent review of the record confirms the correctness of the state court's conclusions, and the appointment of investigators and experts would not alter this determination.  The Court agrees that it would have been futile for trial counsel to attempt to rehabilitate these prospective jurors and that counsel was not ineffective for not making such an attempt.  Accordingly, the Court must grant Respondent summary judgment as to Claim 2.

### B.  CLAIM 3

In Claim 3, Petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to investigate and enter a plea of not guilty by reason of insanity.  The Supreme Court of California disposed of this claim on procedural grounds[2] and on the merits in a postcard

---

[2]This Court has held that the Supreme Court of California's procedural bars of claims as untimely, successive, and pretermitted are inadequate to support the judgment against Petitioner. Accordingly, the claims discussed in the present order that the state court denied on those grounds were

denial.

The passage of Proposition 8 in 1982 codified the *M'Naghten* test, *see M'Naghten's Case*, 10 Cl. & Fin. 200, 210, 8 Eng. Rep. 718, 722 (1843), for determining the insanity of a criminal defendant:

> In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act [or][3] of distinguishing right from wrong at the time of the commission of the offense.

Cal. Pen. Code § 25(b). The "wrong" to which the statute refers is not limited to a legal wrong; rather, a person "who is incapable of understanding that his act is morally wrong is not criminally liable because he knows the act is unlawful." *People v. Skinner*, 704 P.2d 752, 764 (Cal. 1985).

This is not to say that it is sufficient for a person simply to believe a homicide to be morally justified in order to be found insane. Rather, the insanity defense applies "to a person whose mental illness is the cause of an insane delusion . . . if that delusion rendered him incapable of appreciating that his act was wrong." *Id.* at 762. In other words, a person whose mental illness causes a delusion such that he cannot understand that his act is morally wrong would have a viable defense of not guilty by reason of insanity against a charge of criminal wrongdoing.

Respondent contends that he is entitled to summary judgment on Claim 3 because the record lacks evidence that Petitioner was insane at the time of the offense. (Doc. No. 214 at 11–13.) Respondent is incorrect. As discussed below, the record contains substantial evidence tending to prove that Petitioner may have been insane within the meaning of the *M'Naghten* rule.

---

not procedurally defaulted in federal court. *Dennis v. Brown*, 361 F. Supp. 2d 1124 (N.D. Cal. 2005). The Court will not repeat herein its discussion of procedural default.

[3]The actual text of the statute contains the word "and," not "or." However, the Supreme Court of California has held that this was a drafting error such that the statute should be read as if it contained the word "or." *People v. Skinner*, 704 P.2d 752, 758–59 (Cal. 1985).

In the course of the present litigation, Dr. George W. Woods Jr. performed a comprehensive psychiatric examination of Petitioner. Dr. Woods found that Petitioner "was suffering from a Delusional Disorder at the time of the offense." (Doc. No. 163 Ex. J. at 4.) This disorder "culminated in his full-blown belief that his wife not only killed their son but that the civil jury understood that she had killed their son, which was not negligence, and therefore she could not be found negligent." (*Id.*) When Petitioner committed the acts for which he stands convicted, he "believed that what he was doing was the correct thing to do morally [as Petitioner] was acting in the service of a paranoid delusion." Dr. Woods concluded that "[f]rom the period following the civil trial, through the offense, to this day, Mr. Dennis suffered from this fixed, terrible delusion that, on the day of the offense, overwhelmed Mr. Dennis, rendering him unable to distinguish moral right from wrong." (*Id.* at 12.) In summary, Dr. Woods wrote:

> It is my professional opinion that Mr. William Michael Dennis suffered from a Delusional Disorder, severe, at the time of the offense for which he has been convicted. Due to Mr. Dennis's psychotic delusion, he believed—and continues to believe—that his actions were morally right, and that he was acting correctly. This belief arises specifically from his Delusional Disorder and psychotic delusions.

(*Id.*)

Respondent argues that Dr. Woods expressed no opinion that Petitioner was insane, as demonstrated by his "assiduous refusal to invoke that term or its definition in his 13-page declaration." (Doc. No. 214 at 11.) It is true that Dr. Woods did not label Petitioner "insane," nor did he use the exact statutory wording to say that Petitioner "was incapable . . . of distinguishing right from wrong at the time of the commission of the offense." But Dr. Woods's opinion that "on the day of the offense, [Petitioner's delusion] render[ed] him unable to distinguish moral right from wrong" comes extraordinarily close to being such a statement. There is no support for the contention that an expert must quote the exact wording of a statute to make his opinion meaningful. Dr. Woods's declaration clearly tends to support a determination that Petitioner could have been not guilty by reason of insanity. Thus, trial counsel's decision not to enter such a plea well may have constituted ineffective assistance.

Trial counsel may have decided not to enter such a plea on the basis of an inadequate

1  investigation to determine whether Petitioner had a viable insanity defense—despite being urged
2  by at least one expert he did retain to investigate further. (Doc. No. 163 Ex. R at 3; *id.* Ex. J at
3  11; *see also id.* Ex. O at 1.) "Given these preliminary results," it may be that trial counsel should
4  have been "expected to investigate further, rather than 'abandon [his] investigation at an
5  unreasonable juncture.'" *Daniels v. Woodford*, 428 F.3d 1181, 1204 (9th Cir. 2005) (quoting
6  *Wiggins*, 539 U.S. at 527).

7        In short, there is sufficient evidence in the record to raise a triable issue of fact as to
8  whether trial counsel rendered ineffective assistance of counsel by failing to investigate and enter
9  a plea of not guilty by reason of insanity. Accordingly, the Court must deny Respondent
10 summary judgment on this claim.

## C.  CLAIM 5

12       In Claim 5, Petitioner alleges that trial counsel abandoned his client in numerous ways
13 and labored under an actual conflict of interest, thereby rendering ineffective assistance. This
14 claim is presented as several subclaims. As explained below, Respondent is entitled to summary
15 judgment as to Claim 5 in all aspects.

16       In Subclaim 5.B.1, Petitioner challenges his trial counsel's decision to defer his opening
17 statement until after the prosecution presented its case. The Supreme Court of California
18 disposed of this claim on procedural grounds and on the merits in a postcard denial. "The timing
19 of an opening statement, and even the decision whether to make one at all, is ordinarily a mere
20 matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of
21 ineffective assistance of counsel." *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th
22 Cir. 1985). At Petitioner's trial, counsel's decision was consistent "with counsel's apparent
23 strategic decision to keep open the option of asserting [that] the evidence failed to establish
24 [Petitioner] was the killer." 950 P.2d at 1079. Assessing the decision to defer the opening
25 statement "from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, the decision was
26 reasonable and thus not deficient.

27       Petitioner contends in Subclaim 5.B.2 that trial counsel was ignorant of the law of fetal
28 homicide—in particular, that manslaughter is not a lesser included offense of the murder of a

1  fetus. Petitioner argues that trial counsel should have argued that Ms. Erbert's fetus was "born
2  alive" when Petitioner cut her womb open, and therefore was a human being for whose death the
3  jury could have found Petitioner guilty of manslaughter rather than murder. However, the
4  Court's independent review of the record compels the conclusion that the Supreme Court of
5  California correctly determined that "[t]he fetus never breathed or lived independently of
6  Doreen," 950 P.2d at 1057, "[t]he expulsion of the fetus from Doreen's womb in no way
7  resembled the live birth of a human being," *id.* at 1056, and "[t]here simply was not substantial
8  evidence that the fetus was born alive under any recognized criteria," *id.* at 1057. Because no
9  rational finder of fact could have found that the fetus was a human being, Petitioner could not
10 have been found guilty of manslaughter rather than murder. Petitioner suffered no prejudice
11 from trial counsel's ignorance of the law of fetal homicide.

12       In Subclaim 5.B.3, Petitioner claims that trial counsel was unaware that knowledge of a
13 woman's pregnancy was an element of fetal murder; Petitioner did not know that Ms. Erbert was
14 pregnant at the time of the offense; Petitioner therefore could not have been guilty of fetal
15 murder; thus, trial counsel's ignorance prejudiced Petitioner. This subclaim rests on an
16 erroneous assumption: knowledge of pregnancy is *not* an element of fetal murder in California.
17 *People v. Taylor*, 86 P.3d 881 (Cal. 2004). Petitioner attempts to avoid *Taylor* by arguing that
18 *Taylor* changed the law; prior to *Taylor*, he contends, knowledge of pregnancy was required.
19 This is simply incorrect: *Taylor* clarified the law, it did not change it. *Id.* at 886. Indeed, *Taylor*
20 even explicitly harmonized its holding with the state court's holding in Petitioner's own direct
21 appeal. *Id.* at 885.

22       Petitioner asserts in Subclaim 5.B.4 that trial counsel rendered ineffective assistance by
23 not meaningfully pursuing the motion for a change of venue. As the discussion of Claim 1 above
24 demonstrates, Petitioner could not have been prejudiced by trial counsel's actions in this regard.

25       In Subclaim 5.B.5, Petitioner argues that trial counsel's conduct of voir dire was
26 inadequate. The Court's independent review of the record reveals that the Supreme Court of
27 California explained correctly that "counsel had some information on the jurors' experiences
28 with[] and attitudes towards psychiatry, psychologists, and the mental states required for murder"

and an examination of potential jurors along the lines advanced by Petitioner "would have been inconsistent with counsel's apparent strategic decision to keep open the option of asserting [that] the evidence failed to establish [Petitioner] was the killer." Accordingly, the state court correctly concluded that Petitioner "fails to establish that this aspect of voir dire resulted from other than an informed strategic decision." 950 P.3d at 1079.

In Subclaim 5.B.6, Petitioner alleges that trial counsel continually and unnecessarily elicited damaging testimony when cross-examining various witnesses. The Supreme Court of California resolved this subclaim in its opinion disposing of Petitioner's direct appeal. *Id.* at 1079–80. This Court's independent review of the record confirms the state court's conclusion that there is no reasonable probability that the outcome of Petitioner's trial would have been different had the challenged statements not been made.

Petitioner challenges trial counsel's failure to object to the admission of evidence that Petitioner possessed a revolver in Subclaim 5.B.7. However, as the Supreme Court of California correctly concluded, "the fact that [Petitioner] had a choice of weapons, yet decided to hack his victims to death, is relevant to show his intent to kill, and to kill cruelly, after premeditation and deliberation." *Id.* at 1080. Petitioner was not prejudiced by any failure to object.

Petitioner claims in Subclaim 5.B.8 that trial counsel abdicated his rôle as an advocate during his guilt-phase closing argument. The Court's independent review of the record compels agreement with the Supreme Court of California that Petitioner's "criticisms of his counsel's closing arguments amount merely to disagreements about matters of style and technique." Like the state court, this Court finds "no fault with counsel's employment of a humble and respectful tone. . . ." The Court also agrees that Petitioner was not prejudiced by the inadequacies in trial counsel's guilt-phase closing argument. *Id.* at 1081.

In Subclaim 5.B.9, Petitioner challenges trial counsel's actions regarding his "little black book." The Supreme Court of California correctly recognized that Petitioner was not prejudiced by these actions. *Id.* at 1080–81. Petitioner does not oppose Respondent's motion for summary judgment insofar as it relates to this subclaim.

In Subclaim 5.B.10, Petitioner challenges trial counsel's failure to object to a particular

question by the prosecutor and failure to request an admonition after successfully objecting when the prosecutor attempted to ask another question. Petitioner could not have been prejudiced by these actions. Petitioner does not oppose Respondent's motion for summary judgment insofar as it relates to these subclaims.

Petitioner argues in Subclaim 5.C.1 that trial counsel advocated against Petitioner's interests during his closing argument and that counsel's carelessness and indifference to Petitioner's cause resulted in the activation of the sounds of falling bombs emanating from a "Terminator" toy in counsel's pocket at the time the jury was being shown autopsy photographs of Ms. Erbert and her fetus. The Supreme Court of California disposed of this subclaim in a postcard denial on procedural grounds and on the merits. The Court concludes that there is nothing in the challenged statement in the closing argument that went against Petitioner's interests. And while there is no doubt that trial counsel was careless with the toy and that his performance with it was deficient, there is no reasonable probability that the outcome of the trial would have been different had counsel not made the challenged statement or had counsel not carelessly activated the toy in his pocket.[4]

In Subclaim 5.C.2, Petitioner contends that trial counsel ceased to advocate for Petitioner prior to the start of the trial because he was having serious doubts about the nature of his work and the clients he represented; this is evidenced in part by trial counsel's eventual decision to become a prosecutor and his subsequent appointment to a judgeship. The Supreme Court of California resolved this claim with a postcard denial on procedural grounds and on the merits. Assuming without deciding the accuracy of Petitioner's factual allegations in this subclaim, the allegations do no more than explain why trial counsel may not have been at his best during Petitioner's trial or perhaps why counsel's performance was deficient. However, nothing in the subclaim alleges that counsel was deficient in any particular respect. Accordingly, there can be

---

[4]Although the Court concludes that trial counsel's performance with his toy did not in and of itself alter the outcome of Petitioner's trial, this deficiency in his performance is an example of an error that, "when considered cumulatively" with other errors, may "constitute sufficient prejudice to justify granting the writ," *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002), as contended in Claim 25, which is discussed below.

no independent basis in Subclaim 5.C.2 for finding counsel's assistance ineffective.

### D.  CLAIMS 11 & 17

In Claim 11, Petitioner argues that during the guilt phase of the trial, counsel failed to present compelling evidence of mental disease, which would have negated malice and reduced Petitioner's culpability from murder to manslaughter.  In Claim 17, Petitioner alleges that trial counsel rendered ineffective assistance in the penalty phase of Petitioner's trial by failing to present compelling evidence of mental disease in mitigation.  The Supreme Court of California disposed of these claims in a postcard denial on procedural grounds and on the merits.

The defense that trial counsel did present was premised primarily on the claim that Petitioner suffered from a mental disease.  950 P.2d at 1049–50.  The primary witness for the defense at the guilt phase was Dr. Samuel Benson, a psychiatrist who diagnosed Petitioner as having had a major depressive episode over his son's death, as well as having a dependent personality disorder.  While Dr. Benson did testify that these disorders "at the time of the killings had 'a tremendous impact' on [Petitioner's] acts," Dr. Benson did not offer any testimony that would have negated a finding of malice.  Trial counsel presented no additional mental-health evidence whatsoever at the penalty phase.  *Id.* at 1050.

Respondent contends that he is entitled to summary judgment on Claims 11 and 17 because the record lacks evidence that Petitioner suffered from a mental disease at the time of the offense that would negate malice, (Doc. No. 214 at 27), and because trial counsel presented at least some mental-health evidence, (*id.* at 34–36).  Respondent is incorrect for the same reasons that his similar argument discussed above in connection with Claim 3 is incorrect.  Indeed, the same evidence that would support a finding that Petitioner was insane also would support a finding that he acted without malice and would be compelling evidence in mitigation.  And, as with Claim 3, trial counsel may have failed to present such evidence on the basis of an inadequate investigation, even though he indisputably conducted some investigation.

As is the case with Claim 3, the evidence in the record is sufficient to raise a triable issue of fact as to whether trial counsel rendered ineffective assistance of counsel by failing to present compelling evidence of mental disease, which would have negated malice and reduced

Petitioner's culpability from murder to manslaughter and which would have been compelling in mitigation; indeed, there appears to be no evidence to the contrary. Accordingly, the Court must deny Respondent summary judgment as to Claims 11 and 17.[5]

### E.  CLAIM 18

In Claim 18, Petitioner challenges trial counsel's performance in the penalty phase of his trial in several respects; this claim is presented in several subclaims. The California Supreme Court denied some aspects of this claim on the merits in its opinion disposing of Petitioner's direct appeal, 950 P.2d at 1081, and the remainder of this claim in a postcard denial on procedural grounds and on the merits. As explained below, with the exception of Subclaim 18.B.7, Respondent is entitled to summary judgment with respect to this claim.

The Court's independent review of the record reveals that the Supreme Court of California accurately described the brief penalty phase as follows.

> By stipulation, the trial evidence was deemed included in the penalty phase. The prosecution introduced as additional evidence the materials found in [Petitioner's] toolshed, which the prosecutor connected to [Petitioner's] plan to drown the Erberts.
> [Petitioner] offered evidence from his friends and associates as to his childhood difficulties, his shyness and loneliness due to his hearing problem, his friendly and easygoing nature, his pride and love for his son and his devastation at Paul's death, his honesty, thoughtfulness, and sensitivity, his good record at Lockheed, and his compassion for others. [Petitioner's] mother presented a pictorial biography of [Petitioner's] life and their relationship and spoke of awards he won. The jury also heard a tape recording of [Petitioner] and his son.

950 P.2d at 1050.

Petitioner alleges in Subclaim 18.B.1 that trial counsel "failed to present a mass of critical evidence" in mitigation, including evidence related to his hearing and speech impediments, his eating disorder, his teenage depression, and the depth of his love for his son. However, trial counsel did present some evidence in these respects. It may be that other evidence would have been stronger than the evidence actually presented; indeed, there can be little doubt that counsel's

---

[5]The component of Claim 17 regarding Petitioner's lack of a criminal record is subsumed by part of Claim 18.B.3 and is effectively addressed in the discussion of that subclaim.

mitigation presentation was minimal; even so, any additional presentation would have been largely duplicative. There is no reasonable probability that the additional evidence contemplated in this subclaim would have affected the outcome of the penalty phase.[6]

Subclaims 18.B.2–6 involve challenges to trial counsel's penalty-phase argument. The Court's independent review of the record leads it to agree with the Supreme Court of California that these challenges "amount merely to disagreements about matters of style and technique"; the Court finds "no fault with counsel's employment of a humble and respectful tone that acknowledged the jury's ultimate responsibility for defendant's fate." Accordingly, the Court is "not persuaded" that counsel's penalty-phase argument, while weak, was deficient. In addition, in light of the evidence actually presented, there is no reasonable probability that a superior argument would have altered the outcome of the penalty phase.[7] *Id.* at 1081.

In Subclaim 18.B.7, Petitioner argues that trial counsel unreasonably neglected to ask the defense witnesses who testified at the penalty phase whether they felt that Petitioner's life should be spared. Petitioner correctly points out that a central part of the prosecutor's closing argument rested on the fact that "not one witness asked that his life be spared. Not one had the nerve." (Doc. No. 233 at 55.) However, it appears from the record that it is likely that at least some of the defense witnesses, if not all of them, would have asked that Petitioner's life be spared if only trial counsel had asked them. Accordingly, trial counsel's performance may have been deficient in this regard. Moreover, in light of the central rôle this issue played in the prosecutor's argument, there is a triable issue of fact as to whether the deficiency in counsel's performance

---

[6]The component of Subclaim 18.B.1 regarding mental-health evidence is subsumed by Claim 17 and is effectively addressed in the discussion of that claim. In addition, any deficiencies in trial counsel's mitigation presentation may contribute to a finding of prejudice resulting from cumulative errors in connection with Claim 25. *Cf. (Terry) Williams v. Taylor*, 529 U.S. 362, 397–98 (in capital habeas action, court must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced at the habeas proceeding—in reweighing it against the evidence in aggravation").

[7]To the extent that these subclaims assume superior argument in light of additional mitigating mental-health evidence, they are subsumed by Claim 17 and are effectively addressed in the discussion of that claim.

prejudiced Petitioner. Accordingly, the Court must deny Respondent summary judgment on Subclaim 18.B.7.

### III. CLAIMS 6, 7 & 10

In Claim 6, Petitioner contends that he was entitled to an instruction on voluntary manslaughter in connection with the killing of the fetus. Relatedly, in Claim 7, Petitioner alleges that the prosecutor misrepresented the state of the evidence to the trial court that the fetus was a fetus and not a human being, thereby depriving Petitioner of a manslaughter instruction. The claim also alleges that the prosecutor, having secured that instructional decision, committed further misconduct by then arguing that the fetus was a human being who was born alive and then killed outside the womb. In Claim 10, Petitioner argues that the instruction informing the jury that "because a viable fetus is not a human being, you may not find the defendant guilty of manslaughter of the fetus" violated Petitioner's right to a determination of all elements of the crime and thereby violated due process.

The Supreme Court of California denied Claim 6 on the merits in its opinion disposing of Petitioner's direct appeal. 950 P.2d at 1055–57. The state court denied Claims 7 and 10 on procedural grounds and on the merits in a postcard denial.

These claims rest on the assumption that Ms. Erbert's fetus may have been "born alive" when Petitioner cut her womb open, and therefore may have been a human being for whose death the jury could have found Petitioner guilty of manslaughter rather than murder. However, as noted above in the discussion of Subclaim 5.B.2, the Court's independent review of the record compels the conclusion that the Supreme Court of California correctly determined that "[t]he fetus never breathed or lived independently of Doreen," 950 P.2d at 1057, "[t]he expulsion of the fetus from Doreen's womb in no way resembled the live birth of a human being," *id.* at 1056, and "[t]here simply was not substantial evidence that the fetus was born alive under any recognized criteria," *id.* at 1057. Because no rational finder of fact could have found that the fetus was a human being, Petitioner could not have been found guilty of manslaughter rather than murder. Moreover, while the prosecutor did misrepresent the fetus as a "baby" and a "child" in her argument, she never suggested that the fetus had been born alive. Accordingly, Petitioner was

not entitled to a manslaughter instruction, the prosecutor did not materially misrepresent the state of the evidence regarding the status of the fetus, and the jury instruction challenged in Claim 10 did not violate due process. Respondent is entitled to summary judgment as to Claims 6, 7, and 10.

### IV.  CLAIM 12

In Claim 12, Petitioner alleges that the trial court erroneously instructed the jury, pursuant to CALJIC No. 2.10, that it could not accept the statements made by Petitioner to Dr. Benson for their truth, but only for their value in assisting Dr. Benson in reaching his conclusions and opinions.[8] The Supreme Court of California denied this claim on the merits in its opinion disposing of Petitioner's direct appeal. *Id.* at 1073–75.

As the state court correctly observed in resolving this claim, "the trial court's decision to give CALJIC No. 2.10 was not erroneous in any of the usual senses of being legally incorrect, misleading, or unrelated to the facts of the case." Indeed, "[t]he propriety of the instruction was manifest, inasmuch as [Petitioner] could not offer his own hearsay statements as evidence of the truth of what he told Dr. Benson." *Id.* at 1074. Moreover, as the state court correctly explained, Petitioner's contention that the prosecutor ignored this instruction "lacks support in the record." *Id.* at 1075. The Court must grant Respondent summary judgment with respect to Claim 12.

### V.  CLAIM 16

Petitioner contends in Claim 16 that the trial court erred in questioning the jury as to its numerical division in the absence of counsel, thereby depriving Petitioner his rights under the Sixth and Fourteenth Amendments to an impartial jury and a fair trial. The Supreme Court of California denied this claim on the merits in its opinion regarding Petitioner's direct appeal. *Id.* at 1077–78.

Petitioner relies on *Brasfield v. United States*, 272 U.S. 448 (1926), for the proposition that such an inquiry requires reversal. However, *Brasfield* did not announce a rule of

---

[8]The Court previously dismissed as procedurally defaulted the portion of the claim alleging that the trial court unfairly surprised Petitioner by improperly changing its ruling on this issue during the instructions conference. (Doc. No. 105 at 11–12.)

constitutional dimension. Rather, when reviewing a state judgment on habeas, "[t]o determine whether such coercion of the jury's deliberative process occurred, the inquiry by the judge must be viewed in light of the context in which it was made, not in isolation." *Locks v. Sumner*, 703 F.2d 403, 406–07 (9th Cir. 1983). Here, there is nothing in the record that would support a finding that the jury was coerced, as the Supreme Court of California correctly apprehended. 950 P.2d at 1078. Accordingly, the Court must grant Respondent summary judgment as to Claim 16.

## VI.  CLAIM 21

In Claim 21, Petitioner argues that the Supreme Court of California denied Petitioner due process and heightened capital-case reliability. This claim largely overlaps Claims 20 and 22, as to which the Court previously granted Respondent summary judgment. (Doc. No. 117 at 13.) For the same reasons Respondent was entitled to summary judgment on those claims, he is entitled to summary judgment as to Claim 21.

## VII.  CLAIM 23

Petitioner contends in Claim 23 that the unconstitutional use of lethal injection renders his death sentence illegal. In light of the fact that California does not currently have an operative lethal-injection protocol, *see Morales v. Cal. Dep't of Corr. & Rehab.*, — Cal. Rptr. 3d —, No. A120115, 2008 WL 4958279 (Ct. App. Nov. 21, 2008), and there is ongoing litigation regarding lethal injection in California, *see, e.g.*, *Morales v. Tilton*, No. 5-6-cv-219-JF-RS (N.D. Cal. May 28, 2008), the Court finds that it would be premature to resolve this claim at this time. The Court's denial of summary judgment in the present order is without prejudice to a future motion for summary judgment or other motion at an appropriate time.

## VIII.  CLAIM 24

Petitioner asserts in Claim 24 that it would be unconstitutional to execute Petitioner after a prolonged period of confinement. Whatever may be the intrinsic merit of Petitioner's arguments, there is no binding precedent to support this claim. Accordingly, the Court must grant Respondent summary judgment as to Claim 24.

## IX.  CLAIM 25

In Claim 25, Petitioner contends that the cumulative effect of the alleged constitutional

errors in other claims warrants relief.  Petitioner may yet prove that errors of constitutional magnitude occurred at his trial.  If so, the cumulative effect of any such errors may have prejudiced him.  *See Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002).  Accordingly, at least at present, Respondent is not entitled to summary judgment as to Claim 25.

## X.  DISPOSITION

Good cause therefor appearing, Respondent's second motion for summary judgment is granted as to Claims 1, 2, 5, 6, 7, 10, 12, and 16, Subclaims 18.B.1–6 and 18.C.1–2, and Claims 21 and 24; the motion is denied as to Claims 3, 11, and 17, Subclaim 18.B.7, and Claims 23 and 25.

Petitioner shall file a statement indicating whether he intends to file a motion for summary judgment not later than thirty days from the date the present order is filed.  If Petitioner intends to file such a motion, he shall do so not later than sixty days from the date the present order is filed; Respondent shall file any opposition to the motion not later than forty-five days after the motion is filed; Petitioner shall file any reply to the opposition not later than thirty days after the opposition is filed; and, unless it otherwise orders, the Court will take the motion under submission at that time.  If Petitioner states that he does not intend to file a motion for summary judgment, then the parties shall meet and confer and, not later than sixty days after the present order is filed, shall file a joint case-management statement that includes a proposed schedule or schedules for resolving the present action, whether by evidentiary hearing or otherwise, as expeditiously as possible.

IT IS SO ORDERED.

DATED:  December 29, 2008

JEREMY FOGEL
United States District Judge