UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM MICHAEL DENNIS,

    Petitioner,

  v.

RON DAVIS, Warden of California State Prison at San Quentin,

    Respondent.

Case No.  98-cv-21027-JF

**ORDER DENYING CLAIMS 3, 11, & 17 ON THE MERITS AND REQUESTING BRIEFING AS TO WHY PETITIONER'S REMAINING CLAIMS SHOULD NOT BE RESOLVED SUMMARILY**

**DEATH PENALTY CASE**

  On April 21-23, 2014, the Court held an evidentiary hearing on Claims 3, 11, and 17 in this capital habeas proceeding.  Dkt. Nos. 379-381.  The parties then filed post-hearing briefs.  Dkt. Nos. 401 & 403.  Based upon the evidence presented at the hearing, the underlying record and all papers filed to date, the Court finds and orders as follows.

## I.  BACKGROUND

### a. Facts

  The facts of this case have been described at length in previous orders (*see, e.g.* Dkt. No. 117).  As relevant here, Petitioner was found guilty by a Santa Clara Superior Court jury of first degree murder of his former wife, Doreen Erbert ("Doreen"), and the second-degree murder of Doreen's unborn child.  At the time of her murder, Doreen was eight months pregnant.  The jury found as a special circumstance that Petitioner committed multiple murders.  Following a

1

separate penalty phase trial, the jury returned a verdict of death for the killing of Doreen.

Doreen and Petitioner had been married and had a son, Paul, together. The couple divorced, and Doreen married Charles Erbert ("Charles") in 1979. That same year, the Erberts had a daughter, Deanna. In 1980, after Petitioner had returned Paul to the Erberts' home following a visit, Paul drowned in the family's swimming pool. Doreen was home with Paul at the time, and Petitioner blamed Doreen for Paul's death. Petitioner sued Doreen and Charles for the wrongful death of Paul. In March 1982, a civil jury returned a verdict in favor of the Erberts. Charles never spoke to Petitioner again and saw him only once, at a public shopping center.

On Halloween night, 1984, Doreen was stabbed and killed in her home. Doreen was visibly pregnant at the time; she was stabbed in the arm, neck, and stomach, and her unborn child was found lying, in parts, on the living room floor. When the paramedics arrived, the fetus was already dead. Doreen died in route to the hospital. Charles was held for questioning at the scene. Petitioner eventually was arrested and tried for the murder of Doreen and the fetus. Although he initially denied that he had killed Doreen, Petitioner did not contest his identity as the killer at trial. Petitioner's trial counsel argued that the killings resulted from mental illness and were not premeditated or deliberate.

**b.  Procedural Posture**

Following his conviction in the trial court, Petitioner filed an automatic appeal in the California Supreme Court in June 1995. On February 19, 1998, the judgment of the trial court was affirmed. A petition for writ of certiorari to the United States Supreme Court was filed on April 15, 1998, and denied on October 5, 1998. On August 8, 1996, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. That petition was denied on November 4, 1998.

Petitioner's initial petition for writ of habeas corpus in Court was filed on May 2, 2001.

2

The Court found that the petition contained unexhausted claims and ordered Petitioner to file an amended petition alleging only exhausted claims or to dismiss this action. Petitioner filed an amended petition in this Court on August 3, 2001. He also filed an exhaustion petition in state court the same day; that petition was denied on November 27, 2002. A second amended petition was filed in this court on February 11, 2003. Dkt. No. 80 ("Fed. Pet."). Respondent filed an answer on June 18, 2003, and Petitioner filed his traverse on July 14, 2003. Dkt. Nos. 162 & 165.

On July 27, 2009, this Court granted Petitioner's motion for an evidentiary hearing on certain claims of ineffective assistance of counsel: claims 3, 11, 17, 18.B.7, and 25 (including the component of claim 25 described in subclaim 18.B.1). Dkt. No. 250 at 2. The Court later bifurcated the evidentiary hearing, ordering that the first phase of the evidentiary hearing would address only the mental-health claims, i.e., claims 3, 11, and 17. Dkt. No. 254. The hearing took place on April 21-23, 2014. Dkt. Nos. 379-381. Post-hearing briefing was protracted because of several requests by counsel for additional time, and the matter has been under submission for an unusually long period of time because of the volume of the record and this Court's assignment to other duties. On May 15, 2017, the Court denied without prejudice Petitioner's requests to set the second portion of the evidentiary hearing. Dkt. Nos. 415 & 417.

### c. Evidentiary Hearing

In preparation for the evidentiary hearing, Petitioner filed declarations from several medical and legal professionals. *See* Dkt. Nos. 299-1 to 299-9; 373-1 to 373-6; & 375. By agreement between counsel, the declarations were treated as the expert witnesses' direct testimony. Petitioner's counsel also submitted a declaration introducing the draft report of Dr. Alan Garton, who died in March 2010. *See* Dkt. No. 299-3 & -4. In addition to the expert witness declarations, Petitioner filed the declarations of fifty-one lay witnesses. *See* Dkt. No. 299-

3

10 to 299-46 & 299-57 to 299-61.  Finally, Petitioner filed 236 exhibits in support of the expert testimony to be presented at the evidentiary hearing.  *See* Dkt. Nos. 300-304.  Respondent filed thirty exhibits, including the declaration of Dr. Marc Cohen.  *See* Dkt. Nos. 346 to 349 & 373.  Petitioner called several live expert witnesses at the evidentiary hearing.  Some of the experts called by Petitioner were consulted pretrial by Petitioner's trial counsel, including Dr. Alexander Caldwell, Dr. John Stephenson, and Dr. Samuel Benson.  Petitioner also called expert witnesses who were hired post-conviction, including Dr. Dale Watson, Dr. George Woods, and attorney expert Thomas Nolan.  Dkt. Nos. 299-5, 299-8 & 299-9; 375-3 & 375-5; 389; & 390.  Their declarations and testimony are summarized below for purposes of this Order.

### d.  Dr. Garton

Dr. Garton was a psychologist hired by Petitioner's trial counsel in 1988.  Dkt. 299-3 at 5.  He did not testify at trial.  Dr. Garton and Petitioner's trial counsel exchanged several letters back and forth detailing the facts of the case, providing background information about Petitioner, and directing Dr. Garton to contact Petitioner's trial counsel or Dr. Benson with any questions.  *Id.* at 7-12.  Although he did not testify at trial, Dr. Garton apparently began drafting a report detailing his evaluation of Petitioner.  *Id.* at 13-21.  Dr. Garton said that he met with Petitioner five times between February and May 1988 and ultimately concluded that Petitioner suffered from underlying paranoid trends and a transitory paranoid state, as characterized by delusional thinking, affect consistent with the delusional ideas, and preservation of intellectual functions, but in the absence of hallucinations.  *Id.* at 15-16.  Petitioner's condition was differentiated from paranoia by its lack of extreme systemization and from schizophrenia by its lack of fragmentation of associations and the absence of bizarre incongruities.

Dr. Garton's draft report included observations that Petitioner was quiet, soft-spoken, and polite, and that Petitioner had a slight speech impediment.  Petitioner's intellect and judgment fell

within normal limits, his long and short-term memory was intact, and he had a high-average range of IQ functioning. While his affect was inhibited, it was nevertheless appropriate; Petitioner had excellent practical judgment and better-than-average planning ability related to social intelligence. Petitioner also had an excellent sense of social responsibility and ability to anticipate consequences of his initial acts and situations. Dkt. No. 299-3 at 13-14.

Dr. Garton reported that Petitioner's Minnesota Multiphasic Personality Inventory ("MMPI") scores indicated that he had a moderate tendency to minimize his emotional problems. Petitioner's profile also indicated a pattern of accumulated anger and resentments lacking a direct outlet or adaptive means of expression. Petitioner was quick to react with apprehension to unexpected threats to his sense of security and could overreact to anger in others with projection of his own feelings, as well as a strong need to avoid blame. *Id.* at 14. Petitioner's feelings of being unduly burdened and unfairly treated could involve underlying projections of his own feelings. Dr. Garton noted that Petitioner expressed anger and was prone to rigidly over-controlling his hostility for long periods of time, resulting in explosive outbursts; however, those outbursts often were entirely verbal and more likely to come out in situations that were unlikely to lead to Petitioner being immediately punished. *Id.* Petitioner became tense, nervous, and self-preoccupied when he felt threatened. *Id*.

Dr. Garton also observed that Petitioner's anxieties were likely to involve repetitive worries and his habits may have shaded toward ritualistic behaviors; such rituals, such as Petitioner's obsessive fantasies about drowning Doreen and Charles Ebert, would in part serve to channel his resentments. Petitioner tended to be self-negative and self-critical and would punish himself excessively for impulsiveness and subsequent guilt within his rigid and punitive personal code. Dr. Garton wondered whether Petitioner punished Doreen to assuage his own guilt. *Id.* Petitioner's responses to the Rorschach test indicated that while Petitioner's reality testing was

5

basically intact, his reality operations were impaired under conditions of emotional stress. Dkt. No. 299-3 at 15. Petitioner's emotions had a significant impact on his cognitive operations and could give rise to illogical and even delusional thinking. Petitioner had a tendency toward a fusion of ideas as in delusional thought formation. Dr. Garton also found evidence of unrestrained expression of emotional impulses, especially anger and aggression. While Petitioner appeared over-controlled, conventional, over-conforming, inhibited, and guarded on the surface, beneath the surface, Petitioner felt helpless and out of control of his emotional impulses. Under stress, Petitioner was likely to resort to fantasy as a defense first; however, as fantasy was not satisfying, hostility and resentments built up, leading to a loss of control and aggressive acting out.

### e. Dr. Caldwell

Dr. Caldwell was a psychologist retained by Dr. Garton and Petitioner's trial counsel in 1988 to interpret the results of Petitioner's MMPI (Minnesota Multiphasic Personality Inventory) examination. Dkt. No. 299-2. He did not testify at Petitioner's trial. Dr. Caldwell received his Bachelor of Arts and Master of Arts degrees from the University of Minnesota in 1951 and 1955, respectively. He also received a Ph.D. in psychology from the University of Minnesota in 1958. Dr. Caldwell had experience as a clinical psychologist, a coordinator of a psychology intern training program, a professor, and as the founder of his own practice, Clinical Psychological Services, Inc. He received several awards for his work, including the Distinguished Scientific Contribution Award from the California Psychological Association.

Using Petitioner's responses to true/false questions on his MMPI, Dr. Caldwell ran Petitioner's answers through a computer program, which then compiled a report making predictive statements about the traits that would be typical for someone who answered the test the same way. Dkt. 388 at 19. Dr. Caldwell performed a blind examination based on the results of the MMPI only and did not evaluate Petitioner directly. In other words, Dr. Caldwell testified, every

6

sentence in the report was written before the patient ever took the test. *Id.* at 20. Dr. Caldwell's

report, which was apparently closely tracked by Dr. Garton in his report, concluded that

Petitioner's MMPI pattern "most often has been associated with diagnoses reflecting paranoid

trends and transitory paranoid states." Dkt. No. 300 at 33. Petitioner's profile also indicated an

elevated score on the paranoia scale. Dkt. No. 299-2 at 4. While Dr. Caldwell's report did not

mention delusions, he testified during the evidentiary hearing that Petitioner's 1988 profile

indicated the potential for long-term delusion. *Id.* at 30. Dr. Caldwell also testified that his

findings and those made by Dr. Woods are "mutually confirming." *Id.* at 5. During his testimony

before the Court, Dr. Caldwell repeatedly emphasized that he did not know anything about

Petitioner beyond Petitioner's MMPI scores and what he read in Dr. Garton's and Dr. Woods'

reports. Dkt. No. 388 at 38-39.

### f. Dr. Stephenson

Dr. Stephenson, who had retired by the time of the evidentiary hearing, was a clinical

counselor licensed in Maine specializing in bereavement and Post-Traumatic Stress Disorder

("PTSD"). Dr. Stephenson received his Bachelor of Arts degree in psychology from Boston

University, his Master of Arts degree in sociology from the University of Denver, and his Ph.D.

from the Ohio State University. Petitioner's trial counsel retained Dr. Stephenson prior to trial in

1988. At the time, trial counsel asked him to examine how Petitioner's unresolved grief affected

Petitioner's mental condition at the time of the homicide. Dkt. No. 299-6 at 1-2.

Like Dr. Caldwell, Dr. Stephenson did not meet Petitioner, but instead reviewed several

documents prior to rendering his conclusion. Dkt. No. 388 at 101. Dr. Stephenson testified at the

evidentiary hearing that in June 1988, he informed trial counsel that Petitioner did not suffer from

PTSD and, as a result, he (Dr. Stephenson) could not "make a contribution" to the defense." Dkt.

No. 300-33 at 9-10. Dr. Stephenson nevertheless advised trial counsel that explaining Petitioner's

7

grief should be an integral part of Petitioner's guilt and penalty phase defenses. Dkt. No. 299-6 at

1. Dr. Stephenson also recommended that trial counsel arrange for a psychological interview of

Petitioner to explore his self-report that he went "crazy" after his civil trial. According to

Dr. Stephenson, Petitioner felt "tremendous grief" as a result of his belief that he had not done

enough to prevent his son's death. Petitioner's grief was exacerbated by the civil trial verdict

absolving Doreen of wrongdoing, which left Petitioner wondering who was responsible for what

happened to his son. Dr. Stephenson opined that the combination of stressors and Petitioner's

personality rendered him unable to respond rationally to the events that occurred after the death of

his son and up to the night of the crimes. *Id.* at 3-4. Dr. Stephenson also agreed with Dr. Woods'

finding that Petitioner suffered from a severe delusional disorder at the time of the offense. *Id.* at

5. Finally, while Dr. Stephenson testified in his declaration that counsel did not offer him

additional information, it appears from the record that trial counsel sent him a letter offering to

provide him with additional materials. *Id.* at 101.

### g. Dr. Watson

Dr. Watson is a California-licensed neuropsychologist who was hired by Petitioner's

federal habeas attorneys in 2013. Dkt. No. 299-7 at 3. Dr. Watson received his Bachelor of Arts

degree in psychology from the California State College at Sonoma in 1975, his Master of Arts

degree in Clinical Psychology from John F. Kennedy University in 1980, and his Ph.D. in clinical

psychology from the California School of Professional Psychology, Berkeley, in 1988.

Dr. Watson had experience as a staff psychiatrist, a clinical neuropsychologist, a professor, and

member of several professional psychology and neuropsychology groups.

Dr. Watson testified that in October 2013, he evaluated Petitioner at San Quentin State

Prison and performed a neuropsychological battery of tests. Like previous psychologists who

evaluated Petitioner, Dr. Watson found that most of Petitioner's intellectual abilities fell within the

8

"High Average" range. Dkt. No. 299-7 at 3-4. The Wechsler Adult Intelligence Scale-IV test, which measured Petitioner's intellectual abilities, also revealed that Petitioner's processing speed index ("PSI") score fell within the "Average" range. According to Dr. Watson, the PSI index is the most sensitive to the impact of psychiatric and neurological illness. *Id.* at 4. Dr. Watson also found that Petitioner's judgment appeared intact outside the context of a "potentially delusional belief system." *Id.* at 5. The Wechsler Memory Scale IV Flexible Battery, administered by Dr. Watson, revealed the possibility of significant auditory memory deficits, with Petitioner scoring in the "Superior" range on the Visual Memory Index and in the "Borderline" range on the Auditory Memory Index. Dkt. No. 299-7 at 5. The discrepancy between the two indexes was "quite unusual, occurring in just 1.4% of the normative sample." *Id.* Dr. Watson testified that the finding raised the possibility of dysfunction or a lesion in the left temporal lobe, whose dysfunction is closely associated with psychiatric illness. *Id.* at 7. Dr. Watson explained that the left temporal lobe is the part of the brain that controls, among other things, language comprehension. Dkt. No. 388 at 64-65. Yet another test revealed the possibility that Petitioner suffers from a neurologically-based attention disorder such as Attention Deficit Hyperactivity Disorder. *Id.* at 51.

On cross-examination, Dr. Watson acknowledged that he administered a tactual performance test and Trail Making A and B tests, which are generally used to detect brain damage, and found that the results were not indicative of brain damage. Dkt. No. 388 at 59. Dr. Watson also administered the Wisconsin Card-Sorting Test (frontal lobe and executive function test), the Halstead Category Test (effective for detecting brain damage), and the Dellis Kaplan Executive Function System Verbal Fluency Test (a test for mild brain damage). Petitioner's score on each of the tests was within normal limits or otherwise not remarkable. *Id.* at 59-63. While Dr. Watson testified that Dr. Woods' diagnosis of delusional disorder was consistent with his finding that

9

Petitioner might have a dysfunctional left temporal lobe, Dr. Watson stated that he did not make an independent diagnosis to that effect. *Id.* at 64. Dr. Watson also admitted that, with the exception of the Auditory Memory Index results, the tests that should have indicated potential brain damage related to the left temporal lobe yielded results that were either normal or not remarkable enough to indicate brain damage. *Id.* at 66.

### h. Dr. Benson

Dr. Benson is a forensic psychiatrist who was retained by trial counsel. Dkt. No. 299-1 at 3. He received a Bachelor of Science degree in premedical science from the University of Arkansas-Pine Bluff in 1956, a Master of Science degree in physiology from Marquette University School of Medicine in 1963, and both a Ph.D.in physiology and pharmacology and an M.D. from the University of Nebraska College of Medicine in 1969. *Id.* at 1. Dr. Benson had experience as a professor and lecturer, medical director of various establishments, president and board member of various medical and forensic organizations, and had more than thirty years of experience performing psychiatric evaluations and giving expert testimony in California. Dr. Benson conducted five psychiatric interviews of Petitioner; the final, and only recorded, interview was conducted while Petitioner was under the influence of sodium amytal, a drug that reduces inhibitions. *See* Dkt. Nos. 299-1; 388 at 152. Dr. Benson was the only mental health professional who testified on Petitioner's behalf during trial, which occurred during the guilt phase. Dr. Benson was not recalled to testify during the penalty phase after all guilt phase testimony was admitted at the penalty phase.

Dr. Benson testified at length at trial about Petitioner's background, recalling Petitioner's hearing loss as a youth, his parents' divorce, his eating disorder, problems keeping a consistent weight, his continued depression from the age of 19 or 20, and his "genuine attempt at suicide" as a young man. Dr. Benson also provided background on Petitioner's marriage to Doreen, their

divorce, and Paul's drowning, for which Petitioner initially blamed himself. According to

Dr. Benson's trial testimony, Petitioner came to blame Doreen for Paul's death because he thought

Doreen did not do enough to save Paul. Petitioner began to think Doreen wanted Paul to die.

Petitioner said he did not see Doreen suffering from Paul's death and alleged that he was the only

sad person at the funeral. He and Doreen argued over funeral expenses and Petitioner's last child

support payment. Petitioner also felt that he had been mistreated by the Erberts.

Dr. Benson testified that Petitioner eventually began to fantasize about killing the Erberts

in retribution for Paul's death. Petitioner told Dr. Benson about a plan he had to drown the Erberts

by placing them in body bags, and then in boxes, and dumping them into the sea from his boat.

Dr. Benson believed it was strictly a fantasy, although Petitioner owned a boat and had two

homemade reinforced, lockable boxes; two apparently hand-stitched body bags; and two anchors

in his toolshed. According to Dr. Benson, on the night of the murder, Petitioner was struggling

with these fantasies when he became overwhelmed by longing for his son as children trick-or-

treated on Halloween night. Petitioner then decided to do something that night, thinking he could

get away with it.

Petitioner admitted to Dr. Benson that he killed Doreen, but insisted that he did not know

Doreen was pregnant. Petitioner also told Dr. Benson that he could not see any color during the

killings and appeared to have only a spotty memory of the incident, leading Dr. Benson to believe

that Petitioner was enraged on the night of the killings. Dr. Benson opined that Petitioner's

"masked rage" made him a ticking time bomb. Dr. Benson also detailed Petitioner's statements

about realizing that Doreen was pregnant after he already had stabbed her.

Based on the information he had received from trial counsel, as well as the information he

learned through the five interviews of Petitioner, Dr. Benson diagnosed Petitioner as suffering

from a major depressive disorder and a dependent personality type. Dr. Benson also testified that

11

Petitioner suffered from delusional thoughts, including that Doreen wanted their son to die and, after losing the civil suit against the Erberts, that Petitioner's civil attorney would kill him. Dr. Benson characterized Petitioner as extremely distressed at the time of the crimes. In Dr. Benson's opinion, the major depressive episode had a "tremendous impact" on Petitioner's acts. Dr. Benson also testified that Petitioner's state of mind sent him into an "automatic condition" that did not allow him to comprehend his actions fully.

At the evidentiary hearing before this Court, Dr. Benson testified that trial counsel did not ask him to make an insanity finding and did not provide him with sufficient materials to review in order to do so. Dkt. No. 299-1 at 2-4. Dr. Benson acknowledged that he was provided with various items, including witness interviews conducted by the Santa Clara Police Department, testing results and draft reports from Dr. Alfred French, Dr. Stephenson, and Dr. Garton, as well as background information about Petitioner's childhood, hearing loss, speech impediment, battle with childhood obesity, attempted suicide, sexual relationship issues, Petitioner's work at Lockheed Martin, and information about the events leading up to Paul's death and the murder of Doreen. *Id.* Dr. Benson also stated that he did not receive a sentencing report compiled by two mitigation specialists, which he described as the "most complete psychosocial history" of Petitioner he had seen, until well after trial. Although it appears that trial counsel had sent Dr. Benson a letter enclosing the psychosocial history prior to trial in 1988. Dkt. No. 388 at 170; RT 3546. Dr. Benson maintained that he did not recall receiving the psychosocial history and did not consider it in evaluating Petitioner in 1988. *Id.* at 170-172. Dr. Benson also admitted that he never asked trial counsel for more materials or information. *Id.* at 171.

Dr. Benson testified that had trial counsel asked him to do so, he would have testified that Petitioner's mental disorders negated malice and that Petitioner was insane at the time of the crimes. Dkt. No. 299-1 at 3 & 5-6. Dr. Benson believed that trial counsel's focus in consulting

12

him was not to determine whether Petitioner was insane or malice could be negated, but rather to determine whether Petitioner was telling the truth when he said that he did not know Doreen was pregnant. Dkt. No. 388 at 130. However, it appears that Dr. Benson's own inferences about trial counsel's motivations and goals differed from what trial counsel was communicating to Dr. Benson in various letters. In one letter to Dr. Benson, trial counsel stated that he hoped Dr. Benson was prepared to testify "that because of mental disease or disorder, [Petitioner] could not deliberate killing Doreen." *Id.* at 136. Trial counsel attached a copy of jury instructions for murder, insanity, and diminished actuality. Trial counsel also went into detail about the significance of California's abolition of the diminished capacity defense and outlined the types of testimony that could be given in lieu of diminished capacity testimony, including testifying that Petitioner was suffering from a mental disease or disorder at the time of the killing and how that disease or disorder impacted Petitioner's mental processes. *Id.* at 137. In another letter, trial counsel asked Dr. Benson to create a report providing an opinion that Petitioner suffered from a mental disease or disorder at the time of the homicide and asked him to include documentation to support the opinion. *Id.* at 134.

Dr. Benson also testified at length about scheduling and conducting the sodium amytal interview. Dr. Benson described trial counsel as being obsessed with finding out whether Petitioner was being truthful when he stated that he did not know Doreen was pregnant, and described the sodium amytal interview as a means to quell trial counsel's concern. Dkt. No. 388 at 139-46. On cross-examination, Dr. Benson admitted that he believed he told Petitioner about sodium amytal interviews and that, although he now states he did not think the interview was helpful to Petitioner's defense, he did not advise trial counsel against holding the interview. *Id.* at 143.

### i. Dr. Woods

Dr. Woods is a physician specializing in psychiatry and neuropsychiatry. Dkt. No. 299-8 at 1. He was hired by Petitioner's state habeas counsel, and his report was submitted to the California Supreme Court in 2001. Dr. Woods received his bachelor's degree from Westminster College in 1969 and his medical degree from the University of Utah in 1977. Dr. Woods received his board certification in psychiatry and neurology in 1992 and became a diplomate in the American College of Forensic Examiners in 1998. Dr. Woods has extensive experience as a clinical director, professor, and an expert witness. He also participated in a National Institute of Mental Health/American Psychiatric Association Fellowship in 1982.

When he was retained, Dr. Woods was asked to answer the following questions:

1. Was [Petitioner] suffering from a mental disease or defect at the time of the offense for which he was convicted?
2. If [Petitioner] was suffering from a mental disease or disorder at the time of the offense, what impact did that mental disease or defect have on his mental state at that time and at subsequent times?
3. Was [Petitioner] not guilty by reason of insanity at the time of his trial? Dkt. No. 299-8 at 2.

Dr. Woods interviewed Petitioner at San Quentin on March 15, 2001, for two and one-half hours and reviewed various materials given to him by Petitioner's counsel, including medical records, family history (parents), Petitioner's autobiography, the reports of Dr. Garton, Dr. Stephenson, and Dr. Benson's trial testimony. *Id.* at 3. Dr. Woods concluded that Petitioner was suffering from a delusional disorder, persecutory type, which was now chronic. Dkt. No. 299-8 at 4. The delusional disorder was born from the environmental vulnerabilities that defined Petitioner's life as well as specific events, starting with the death of Paul. These factors culminated in Petitioner's full-blown belief that Doreen had killed Paul. *Id.* at 4. According to Dr. Woods, Petitioner believed that Doreen had not been found negligent during Petitioner's civil suit against the Erberts because she had killed Paul on purpose. Dr. Woods opined in his report

14

that Petitioner believed that because he was acting in the service of a paranoid delusion, Petitioner believed that what he was doing to Doreen was the correct thing to do morally.

Dr. Woods also recounted large portions of Petitioner's personal history, including that Petitioner had one brother, that he began wearing a hearing aid as a young child, and that his hearing loss was mistakenly treated as mental retardation, which led to his being placed in Special Education classes. Dkt. No. 299-8 at 4. Dr. Woods noted that one of Petitioner's friends from junior high school, David Thorn, stated that Petitioner was "the kind of kid that everyone made fun of" and that Petitioner had "an acute sense of alienation." *Id.* at 4. In Dr. Woods' opinion, that type of sense of isolation and social awkwardness presaged the hyper-vigilance and sense of alienation that often provides a fertile environment for a delusional disorder to develop. *Id.* at 5. Dr. Woods also noted that Petitioner's "limited repertoire of skills when it came to expressing his inner life," that had been observed by Thorn, was mirrored in later objective psychological testing, where Petitioner's specific ways of responding to the world were expressed through efforts to minimize his pathology despite his manifesting elevated paranoia scales and delusional thinking. *Id.* Petitioner's limited social ability and isolation continued throughout his work history.

Dr. Woods also touched on Petitioner and Doreen's relationship and Paul's subsequent death. According to Dr. Woods, "everyone acknowledged that [Petitioner] was a wonderful, involved father." Dkt. No. 299-8 at 5. Dr. Woods noted that one of Petitioner's coworkers testified that "Paul was Petitioner's life" and that Petitioner bragged about Paul, along with his house, all the time. Dr. Woods opined that Paul's death was the first in a series of tragic events in Petitioner's life that ultimately led to Doreen's murder. Dkt. No. 299-8 at 5. Petitioner had been concerned about the safety of Doreen's pool after Doreen's puppy drowned in it. Petitioner testified in his civil trial that he told Doreen that he would help her pay for a safer fence, but that his offer was rejected. According to Dr. Woods, Petitioner continues to be flabbergasted when

15

discussing Doreen's explanation of her trying to find Paul the night that Paul drowned. Specifically, Petitioner could not understand Doreen's statement that she could not look in the pool because she was afraid of what she would see and instead ran to a neighbor's house to ask him to look in the pool for her. *Id.* at 6. Petitioner was with a friend when he received a phone call notifying him of Paul's death, and his friend noted that Petitioner "let out a loud, terrible scream, and started to cry. When Paul died, Mike was left with nobody." *Id.* Petitioner had dropped Paul at Doreen's home less than an hour before he drowned.

Dr. Woods opined that Petitioner's limited adaptive psychological skills, vulnerability to isolation, and his emotional rigidity were the damaged foundation for the series of profoundly traumatic events making up the five years following Paul's death. Dkt. No. 299-8 at 6. Petitioner talked about his loss and held up Paul to an extreme degree, often talking about Paul and marking the developmental milestones he would have likely had if he was alive. Dr. Woods believes that Petitioner's short stint in therapy did not show that Petitioner was able to resolve his grief, but rather that he was unable to express his emotion.

Petitioner's grief over Paul's death was accompanied by confusion over whether Paul's death was negligence or intentional lack of protection on Doreen's part. According to Dr. Woods, the idea that Doreen intentionally let Paul drown was "the logical kernel that eventually grew through suspicion, through hyper-vigilance, through over-valued ideas, into a delusion" and drove him to his civil suit. *Id.* at 7. Petitioner told Dr. Woods that he wanted Doreen to accept responsibility for her negligent acts and depicted himself as a reluctant plaintiff, noting that the attorney he consulted about child support payments suggested the negligence lawsuit. Once the suit was filed, Dr. Woods opined that it focused Petitioner's increasing paranoia. Petitioner told Dr. Woods that the idea that Doreen wanted Paul dead came from a statement by one of his coworkers, which provided him with the missing piece of the puzzle as to why he lost the trial.

16

Petitioner thought that Doreen was not only capable of intentionally killing Paul, but also jealous of the unconditional love Paul had for Petitioner.

Petitioner's growing cognitive slippage created a transition from questions to judgments and judgments to delusions, which underlined the deterioration of Petitioner's thought processes and galvanized Petitioner's delusional thinking. Dkt. No. 299-8 at 7. Petitioner was shocked when the jury found the Erberts not negligent, which led Petitioner to decompensate affectively, emotionally, and overtly. It also led to Petitioner developing an intense hatred toward Doreen. Dkt. No. 389 at 305. Dr. Woods interpreted Petitioner's decision to kill Doreen not as punishment for her, but as retribution for her failure to accept responsibility for Paul's death. *Id.* at 307-08. Following the civil trial, Petitioner described himself, and was described by others, as depressed, not sleeping, not eating, and unable to function. Dr. Woods stated that the reports were consistent with a mental state at the onset of delusional thinking, when a person wants to understand overwhelming circumstances but the only explanation is beyond reality. During his March 2001 interview with Dr. Woods, Petitioner described having a "nervous breakdown." Dkt. No. 299-8 at 7-8.

Dr. Woods also conducted psychological testing of Petitioner and found Petitioner was clinically paranoid in spite of attempting to present himself as less pathological. Dr. Woods opined that Petitioner masked the depth and quality of his fixed, circumscribed, encapsulated delusion that Doreen killed Paul. Dr. Woods cited the DSM-IV in making his diagnosis, explaining that a delusion is defined as:

> [a] false belief based on incorrect inference about external reality that is firmly sustained despite what everyone else believes and despite what constitutes incontrovertible and obvious proof of evidence to the contrary. The belief is not one ordinarily accepted by other members of the person's culture or subculture. . . . It is often difficult to distinguish from a delusion and an overvalued idea (in which case the individual has an unreasonable belief or idea but does not hold it as firmly as is the case with a delusion).

*Id.* at 9. Dr. Woods stated that the progression of Petitioner's thoughts to judgment, or from overvalued idea to delusion, was evident in Petitioner's understanding of the civil jury's findings. Petitioner's pathological paranoia and limited adaptive capabilities were also evident, according to Dr. Woods, in the way Petitioner was described in the days after the trial: flat, expressing no emotion at all, and similar to the look a Vietnam veteran might have in his eyes. *Id.* at 10.

Dr. Woods also opined that Petitioner's prior psychological examinations, specifically the MMPI tests administered to Petitioner in 1985 and 1988, which showed high paranoia scales despite Petitioner's attempt to minimize his pathological problems, supported his diagnosis of a delusional disorder. Dkt. No. 299-8 at 10. Dr. Woods noted that Petitioner's symptoms, including the breakthrough symptom of paranoia, most closely track the diagnostic criteria for a delusional disorder as opposed to the psychotic manifestations of a major depressive disorder. Dr. Woods stated that the Rorschach protocol administered by Dr. Garton also documented Petitioner's potential for delusional thinking, underlying paranoid trends, and a transitory paranoid state as categorized by delusional thinking. *Id.* at 11. Dr. Woods did not find it significant or inconsistent with his diagnosis that Petitioner took more than one weapon to Doreen's home on the night of the murder or attach diagnostic significance to Petitioner's statements attempting to distance himself from the crime after the fact. Dkt. No. 389 at 308-10.

Dr. Woods stated that paranoid delusions, or persecutory delusions, are one subtype of delusions found in a delusional disorder, Dkt. No. 299-8 at 11, and that people with that subtype are the most lethal because their delusion is driven by psychotic energy and a loss of contact with reality. Although psychotic states can appear similar in different clinical syndromes, the correct diagnosis is extremely important. Petitioner knew that he was killing Doreen as he stabbed her; Petitioner also did not ascribe his conduct to any other being, had no hallucinations, and, at some point, appreciated the legal consequences of his actions. Dkt. No. 389 at 308-11. While

18

Dr. Garton recognized in his report that Petitioner had a possibility of suffering from delusions, Dr. Woods noted that Dr. Garton's report appears to "stress how limited his evaluation [of Petitioner] was," pointing to Dr. Garton's statement that Petitioner's statement that he went "crazy" for a few months following the civil trial should be examined more closely in a psychological interview. *Id.* at 12.

Finally, Dr. Woods opined that Petitioner suffered from a severe delusional disorder at the time of the offense. Dkt. No. 299-8 at 12. Petitioner's inability to express emotions, blocking of his affective expression, and forcing his emotions into narrow, but deep, vulnerability to psychosis indicate that Petitioner suffered from a fixed delusion that overwhelmed him on the date of the crimes, rendering him unable to distinguish moral right from wrong. Dr. Woods also disagreed with Dr. Cohen's report suggesting that Petitioner did not suffer from a delusional disorder and opined that Petitioner's statements to Dr. Cohen and initial attempts to conceal his motive and involvement in Doreen's murder in fact were consistent with a delusional disorder. Dkt. 375-5 at 2-6.

### j. Mr. Nolan

Thomas Nolan is a California attorney who was retained by Petitioner to testify as a legal expert regarding the competency of Petitioner's trial counsel. *See* Dkt. No. 299-5. Mr. Nolan was engaged by Petitioner's federal habeas counsel in 2013. Mr. Nolan received his Bachelor of Arts degree from Sacramento State College in 1967 and his law degree from the University of California-Davis in 1970. He has been a member of several criminal justice and death penalty organizations since 1976 and has lengthy experience as a criminal defense attorney, professor, and expert witness. He also has received professional recognition for his work as a criminal defense attorney.

Mr. Nolan testified at length about various standards and guidelines for criminal defense

19

attorneys and capital case litigators that have been set out, used, or taught by professional

organizations, including the California Attorneys for Criminal Justice (CACJ), the California

Public Defenders Association, the California Appellate Project, the Office of the State Public

Defender, the NAACP Legal Defense Fund, the National Legal Aid and Defender Association

("NLADA"), and the Southern Poverty Law Center.  Dkt. No. 299-5 at 4.  According to

Mr. Nolan, the 1987 NLADA Standards for Counsel in Capital Cases ("NLADA Standards")

codified the prevailing national practice of capital defense attorneys following the Supreme

Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972).  The American Bar Association

followed suit in 1989, publishing the Guidelines for the Appointment and Performance of Counsel

in Death Penalty Cases ("1989 ABA Guidelines").  Mr. Nolan opined that California's guidelines

and prevailing standards exceeded those of the NLADA Standards and 1989 ABA Guidelines, but

when asked, he was unable to rank the various standards and guidelines against each other or

against the standards required by the Sixth Amendment.  *See* Dkt. 299-5 at 6 & Dkt. No. 389 at

206-211.

Mr. Nolan opined that at the time of Petitioner's trial, reasonably effective counsel should

have understood that capital litigation was complex and time-consuming, and that trial counsel

was obligated concurrently to investigate and prepare for both the guilt and the penalty phase.

Dkt. No. 299-5 at 6-7.  He said that competent trial counsel was required to understand and

analyze sanity and penalty issues before counsel could fully develop and formulate an effective

strategy for either phase of trial.  Reasonably effective counsel would have introduced a variety of

witnesses, both lay and expert, to discuss a defendant's background and mental state at and around

the time of the crimes.  *Id.* at 8.  Reasonably effective counsel would have had expert witnesses

evaluate the defendant and presented a not guilty plea in conjunction with a plea of not guilty by

reason of insanity.  *Id.* at 9.  At the time of Petitioner's trial, it was already standard practice for

20

defense counsel to provide experts with all relevant records of the defendant and his family, and with other persons who possessed potentially relevant information. *Id.* at 19. Counsel also had an obligation to control the selection and preparation of experts and ensure that they possessed relevant background and social history information about the defendant, and to educate them on the role and scope of mitigation, which was not a well-known concept in the early 1990s.

Mr. Nolan also testified that reasonably effective counsel would have made an opening statement at the outset of trial detailing Petitioner's mental illness as a way of suggesting to the jury the absence of the required mental state for murder, Dkt. No. 299 at 10, and that counsel should have known that he had to portray Petitioner as a human being with positive qualities that would outweigh the selective evidence of criminality presented by the prosecution. According to Mr. Nolan, counsel likewise should have known that he had to attempt to show that Petitioner's capital crimes were humanly understandable in light of his past history and the unique circumstances affecting his formative development. *Id.* at 12. Mr. Nolan testified that attorneys representing capital defendants in 1988 were required to conduct an exhaustive multi-generational investigation of a defendant's background and social history, including investigation of the environmental factors affecting the defendant's behavior, personality and mental functioning and the developmental, medical, mental health, educational, military, employment, training, prior criminal and correctional histories, and religious, cultural, and social histories of himself and his family. *Id.* at 14.

At the time of Petitioner's trial, the prevailing standard of care required capital defense attorneys systematically to interview persons regarding all potential mitigation themes without limiting the inquiry to a small set of witnesses or a short time period. Dkt. No. 299-5 at 16. Capital counsel also were required to employ and lead trained guilt and sentencing investigators to assist in the development and presentation of evidence at trial. Once that information was

21

received, capital defense attorneys were required to reformulate mitigation themes and incorporate those themes into the guilt and penalty phase cases. During the penalty phase, counsel was required to investigate, develop, and present evidence—if available—that the defendant would not pose a danger and would adjust well to life in prison if he was sentenced to life without the possibility of parole. *Id.* at 21. Counsel had the responsibility of organizing and structuring the penalty phase into a forceful, unified presentation corroborated with fully prepared witnesses and documentary evidence, erring on the side of inclusion. *Id.* at 21-22.

Mr. Nolan concluded that Petitioner's trial counsel should have called lay witnesses to testify live instead of using their statements for purposes of informing an expert's testimony. Dkt. No. 299-5 at 22. Counsel also should have called mental health witnesses to testify during the penalty phase, including Dr. Benson, as opposed to relying only on the testimony provided by Dr. Benson during the guilt phase. Mr. Nolan opined that counsel should have introduced evidence of Petitioner's background, including that Petitioner had severe hearing loss and was viewed as intellectually disabled throughout his adolescence and adulthood, and should have presented evidence that Petitioner's development was stunted by his parents' divorce when he was nine years old and was traumatized and consumed by Paul's death, which caused Petitioner to suffer delusional beliefs. *Id.* at 24-25. Mr. Nolan also testified that counsel should have introduced evidence that Petitioner had attempted suicide in the past, had no criminal record, and was a positive person and good father. He opined further that counsel should have asked each lay witness whether Petitioner's life should be spared. *Id.* at 25. Each of trial counsel's perceived failures, according to Mr. Nolan, had no strategic basis.

On cross-examination, Mr. Nolan admitted that he had not read any part of Dr. Benson's guilt phase testimony. Dkt. No. 389 at 191. He also admitted that the guidelines and standards from various legal organizations given at training programs and seminars do not have the force of

the Sixth Amendment. Moreover, though he opined that trial counsel's decision to receive his opening statement to the beginning of the defenses was a mistake because of the strength of the evidence showing Petitioner's guilt, he recognized that reserving an opening statement sometimes might be considered a good strategy. *Id.* at 219. Mr. Nolan also acknowledged that indicia of an adequate capital case investigation include evidence that counsel: carried out investigations of the defendant's coworkers, friends, and classmates; reviewed the defendant's and his family's medical, school, and prison records; sought information regarding any prior offenses and all documentation related to them, including juvenile files and records; followed up on suggestions made by experts; performed legal research on the legal issues presented by the case; counsel obtained and reviewed the autopsy report and to the extent necessary, had the autopsy report, reviewed independently; considered the defendant's psychiatric trail; checklists or other documents showing what has been done and what needs to be done; and demonstrated considered judgment in terms of strategy, including notes, billing records, and correspondence. *Id.* at 265-75. Mr. Nolan agreed that trial counsel's file in this case contained many of these items. *Id.* at 275-80.

Mr. Nolan took issue with trial counsel's decision not to find an expert "like Dr. George Woods," who not only would have been capable of discerning a diagnosis of delusional disorder, but also would have been "comfortable" doing so at trial. Dkt. Nos. 299-5 at 24 & 389 at 285. Mr. Nolan testified that while Dr. Benson was a psychiatrist who often testified in criminal cases at the time of Petitioner's trial and was certainly capable of discerning delusional disorder, he would not have taken Dr. Benson's opinion for what it was because it did not include an opinion that Petitioner was insane. Dkt. No. 389 at 285-93. Mr. Nolan admitted that the Sixth Amendment does not require counsel to move through experts until he finds the one who gives him the answer he wants. *Id.* at 396.

23

**k. Dr. Cohen**

Dr. Cohen is a psychiatrist contracted by Respondent to conduct a psychiatric evaluation of Petitioner. *See* Dkt. No. 347-9 at 1. Dr. Cohen received his medical degree from the University of Southern California School of Medicine in 2003 and is board certified in psychiatry and forensic psychiatry by the American Board of Psychiatry and Neurology. Dr. Cohen has experience as a professor, a practicing psychiatrist, consultant to the Mental Health Courthouse in Los Angeles County, and as an expert. *Id.* at 1-2.

Dr. Cohen conducted a psychiatric examination of Petitioner, including two evaluations in February 2014, at San Quentin State Prison. Dr. Cohen was instructed to answer three questions:

1. Does the petitioner suffer from a mental disorder? [¶]
2. Did the petitioner have the ability to understand the nature and quality of the criminal acts, or the ability to distinguish right from wrong at the time the criminal acts were committed? [¶]
3. Does the psychiatric evidence help inform the questions that will be put to the trier of fact regarding whether the petitioner premeditated, or whether he acted with malice aforethought at the time of the murders?

Dkt. No. 347-9 at 3.

Dr. Cohen's report provided a brief background of the crime and what Dr. Cohen refers to as Petitioner's twenty-three "versions" of the crimes, i.e., the differing accounts Petitioner has provided of the killings which, according to Dr. Cohen, "have evolved over time to increasingly portray himself as a righteous avenger of his son's death." *Id.* at 3. Dr. Cohen summarized the accounts as follows:

Petitioner gave a recorded statement to the San Jose Police Department on November 1, 1984 ("Version One"). Petitioner stated that on the night of the murder, he drove home from work and arrived to an empty home. Petitioner had dinner with his mother in her living quarters and consumed one glass of wine. He and his mother passed out candy until approximately 8:30 p.m. At some point, Petitioner began playing with the "skinny" knife in his butcher block, tossing the

24

knife into the air and intending to catch it by the handle, but instead caught the knife by the blade. Dkt. No. 347-9 at 4. As a result, Petitioner cut his index, little, and ring fingers of his right hand. Petitioner described his cuts as "substantial" injuries, but as they did not really hurt, he stated that he did not go to the hospital. Instead, Petitioner cleaned up the blood from the kitchen floor with paper towels as best as he could and went upstairs to wrap the fingers, disposing of the paper towels in the toilet. Petitioner went to bed at approximately 9:00 p.m. Petitioner denied being at Doreen's house, stating he was last there four years prior, and denied killing her. He also denied walking on an overpass walkway a half mile from his home on the night of the murder.

Petitioner continued giving a similar account of what happened on the night of Doreen's murder for some time. When he gave a second statement on November 1, 1984, after he was taken into custody ("Version Two"), Petitioner denied knowing what crime he allegedly had committed. Petitioner told police that he wanted to speak to an attorney and mentioned that he had been at his mother's living quarters playing with some knives. The author of the report noted that Petitioner did not exhibit any remorse, anxiety, depression, or guilt. Petitioner requested something to eat.

Petitioner again recounted the knife story and denied involvement in Doreen's murder on November 2, 1984, during a psychiatric evaluation ("Version Three"); in a November 6, 1984 statement to the San Jose Mercury News ("Version Five"); a November 7, 1984, telephone call to the San Jose Mercury News ("Version Seven"); and a November 7, 1984, interview with the Peninsula Times Tribune ("Version Nine"). On November 5, 1984, Petitioner was released from custody and made statements to television news reporters ("Version Four"). Petitioner was asked to make a statement to Doreen's family and replied that he was sorry that "it did happen to [th]em" and that he hoped they caught the person who did it. Dkt. No. 347-9 at 5. Responding to questions, Petitioner stated that he did not consider himself a free man until the other person was

25

caught and that he believed police released him because he was "not the one who did it." *Id.* Petitioner repeated these statements on November 6, 1984, during an interview with the Peninsula Times Tribune ("Version Six").

In his "Version Five" statement to the San Jose Mercury News, Petitioner said that he thought of his son every day but not to the extent of revenge. Dkt. No. 347-9 at 5. Petitioner also said that investigators told him only briefly that Doreen had died, that he had been isolated in jail, and that police took his glasses from him. Petitioner stated that he did not know Doreen's murder was "real brutal" until some inmates told him. Petitioner stated that he had no idea who did it, but was sure that he was considered the prime suspect because of Paul, the fact that he was Doreen's ex-husband, and the fact that police had no other suspects. Petitioner made similar statements about the police to the Peninsula Times Tribune in his "Version Six" statement and to the San Jose Mercury News in his "Version Seven" statement.

On November 6, 1984, Petitioner made statements to police officers while being transported to police headquarters ("Version Eight"). Petitioner told the officers that he had adjusted to jail after he was taken into custody on November 1, 1984, and mentioned that he had been receiving threatening telephone calls. Dkt. No. 347-9 at 6-7. Petitioner asked twice what new evidence police had to arrest him. When told by police officers that he had been arrested because they thought Petitioner killed Doreen, Petitioner responded, "Yeah, that's one reason why . . . well, one of many reasons why I'd never do it. 'Cause I always know that I, you know . . . Doreen ever to get killed, I'd be a suspect. I didn't want to go to jail." *Id.* at 7. Petitioner then suggested that perhaps Doreen's killing was related to drugs because one of Doreen's friends had told Petitioner that Charles was "heavy into cocaine" when he first started dating Doreen. Petitioner mentioned that he wanted to find an attorney. While walking from the police car to an interview room, Petitioner told police that he wrote two letters to Doreen after his wrongful death

26

suit and that he was considering sending the letters to newspapers. Petitioner suggested that police

wanted to "pin it [the murder]" on him because the killings must have been done by someone

insane, like a serial killer, who is hard to locate. *Id.* Petitioner also told police that it was possible

that they took hair from his head during an examination and planted evidence against him.

On March 18, 1985, Petitioner told his attorney that he had killed Doreen ("Version Ten").

Dkt. No. 347-9 at 8. Petitioner told his attorney that he thought Paul's death was accidental until

he heard Doreen's story during the wrongful death suit. To Petitioner, Doreen's story made him

think that Doreen had murdered Paul. Petitioner said the jury verdict compounded his anger and

that he felt his personality change after the jury voted against having Doreen pay half of the

expenses. Petitioner purchased the machete he used approximately six weeks or two months prior

to the murder. He paid cash for the machete along with some other items, including fertilizer and

some gardening books. Petitioner kept the machete in his bedroom closet and did not tell anyone

about it. On Halloween 1984, Petitioner watched a program on television until approximately

8:30 p.m. and then left his home wearing two masks: a Frankenstein mask under a wolf mask. *Id.*

at 8. Petitioner carried a bag containing the machete, a small knife, and his .357 magnum and

walked to Doreen's house. Dkt. No. 347-9 at 9. He took the wolf mask off when he reached the

bridge that crosses the highway and placed it in his bag because he was having trouble aligning the

eyeholes for both masks. Petitioner stated that after crossing the bridge, he "went into automatic

and only vaguely remembers cutting Doreen up." *Id.* Petitioner recalled stabbing her once and the

machete slipping up, cutting his hand, and dropping the machete. Petitioner was wearing rubber

gloves that he wore at a party along with his wolf mask; he had forgotten that photos of him

wearing the items were taken at the party. After cutting himself, Petitioner thought he cut off his

fingers because he was unable to move them. At that point, Doreen was still alive, but lying

down. Petitioner picked up the machete and cut her a few more times. Petitioner remembered

27

loudly saying "you killed my son." *Id.* at 10.

Petitioner told his attorney that he did not know Doreen was pregnant and that he had not seen her since the court case. Petitioner stated that he held the machete with one finger. The baby came out of Doreen and Petitioner was shocked; he had not noticed she was pregnant when he entered the house. Petitioner remembered saying "my God, you're pregnant" when the baby came out. *Id.* at 9-10. Petitioner stated that his stepmother, who was close to Doreen, had not told him about Doreen's pregnancy. Petitioner denied striking the baby after it was outside the womb and did not recall seeing the baby cut when it came out. He stated he was positive he did not cut the baby afterwards because he did not want to leave footprints in Doreen's blood. Petitioner stated that he made a final cut to Doreen's head and took off out the door. He estimated that he was in the home for approximately one minute.

Petitioner recalled holding the bag in his left hand and said he believed that the mask must have fallen out. Dkt. No. 347-9 at 10. He did not notice the mask was missing as he left. Petitioner recalled breathing very heavily and that there was a man on the other side of the street when he got over the foot bridge. Petitioner arrived at home, wrapped his hand, and began getting rid of evidence, including the machete and the clothing he wore. Petitioner also cut and threw out a piece of carpet and some rags that had been saturated in blood. He did not notice whether the mask was still in the bag when he got rid of it. He did not throw away his gun because it had no blood on it. Petitioner went to bed at around 10:00 p.m. *Id.* at 10.

Petitioner stated that he remembered seeing one vehicle outside Doreen's house. Dkt. No. 347-9 at 10. Petitioner thought Charles still had two cars, although he no longer did. Petitioner recalled that the house appeared to have the lights out. Machete in hand, he rang the doorbell twice and did not hear anything for a while. Petitioner stated that he honestly believed Doreen killed Paul and that it was not an accident. Petitioner said he felt that way because of the

28

way she treated Paul's death. He believed Doreen lied and protected the insurance company. He said he was confused by the jury verdict. Petitioner stated that Doreen easily could have killed Paul because she was jealous that he and Paul were very close; Paul would cry when Petitioner dropped him off at Doreen's house. Petitioner stated that he believed Doreen thought Paul could take care of himself. Petitioner also blamed Doreen for not jumping into the pool after Paul. Referring to some of the items found at his residence, Petitioner told his attorney that the boxes found in his garage were not coffins, but rather boxes in which he intended to place body bags containing Doreen and Charles in order to transfer them onto his boat, sail out to sea, and throw the weighted body bags into the sea. Dkt. No. 347-9 at 10. However, Petitioner abandoned the idea after realizing his method would not work.

On May 3, 1985, Petitioner told a polygraph operator ("Version Eleven") that he was thinking about killing Doreen when he purchased the machete "a long time" prior to her murder on Halloween 1984. Dkt. No. 347-9 at 10-11. Petitioner said that he did not know Doreen was pregnant until the fetus "popped out and bounced like a rubber doll three or four feet away from Doreen." Petitioner was shocked. Petitioner said Doreen looked up at him while he was stabbing her and saying "you killed my boy," to which Doreen replied "I didn't mean to." *Id.* at 11. Petitioner said Doreen's statement had haunted him ever since. Petitioner repeated the exchange of words between him and Doreen to his investigator on April 4, 1988 ("Version Fourteen") and to Dr. Garton ("Version Fifteen") and throughout various interviews Dr. Benson (Versions "Sixteen," "Seventeen," "Eighteen," "Nineteen," and "Twenty"). *See* Dkt. No. 347-9 at 13-19.

On June 12, 1986, Petitioner told his investigator ("Version Twelve") that he felt he had a ninety percent chance of conviction, but thought that evidence regarding Paul's death might help him get a second degree murder conviction. Dkt. No. 347-9 at 11. The investigator told Petitioner that he would need to see a psychiatrist in order to develop that sort of mental defense. Petitioner

29

noted concern that he failed his polygraph test in which he said that he did not know Doreen was pregnant. Petitioner also mentioned a then-recent case in which a father had killed the convicted killer of his daughter in a courtroom and received a lesser conviction, but the investigator told Petitioner that the factual situation in Petitioner's case was different because no one felt Doreen was responsible for a murder when Paul died. On July 26, 1987, Petitioner again told his investigator ("Version Thirteen") that he felt Doreen murdered Paul and that his attorney must visualize his crime in light of his pain, anguish, and anger. Petitioner also reiterated that the boxes described as coffins were for his boat for storage purposes. *Id.* at 12.

During the "Version Fourteen" statement to his investigator, Petitioner was asked why the murder happened on Halloween 1984. Petitioner stated that he was very depressed at the time; he had been unfairly demoted at work, he was having financial problems, he thought he had contracted herpes from a long-time girlfriend, and he had recently broken up with that girlfriend. Petitioner stated that he was extremely lonely and the hurt from losing his court case, as well as from Paul's death, was "hammering away" at him. Dkt. No. 347-9 at 12. He felt unjustly treated. Petitioner said that he thought about Paul after seeing the kids trick-or-treating, stating that he missed Paul greatly. Petitioner mentioned that he had to fill out a top secret security form for his job and it gave him the opportunity to go check to see if Doreen still lived at her house.

Petitioner's hatred of Doreen grew; according to Petitioner, she had treated him badly and took his son's life. Petitioner thought Paul's death was not an act of God, not negligence, but murder. The civil jury concluded that Paul's death was an accident, but they did not know whether he loved his son or just wanted money. Petitioner expressed sorrow for his actions because they hurt people other than Doreen and Charles; he also blamed the civil jury for not returning any award to make him feel better, although no amount of money could replace Paul. Petitioner stated that he held Doreen responsible for Paul's death and began having fantasies of

killing her and Charles by kidnapping and drowning them so they would know how Paul suffered and died. Indeed, Petitioner told the investigator that he asked Doreen how it felt to drown on the night of the murder. Petitioner told the investigator that he wanted to testify to let the jury know that he went into a rage that night and did not recall everything that occurred when he hit her with the machete; he again stated that he did not intend to kill the fetus and did not hit the fetus after it was expelled from Doreen, a statement he reinforced many times. *See* Dkt. No. 347-9 at 12, 13, 15, 16, 19, 20, 24, 25, & 26.

Petitioner's "Version Fifteen" statement to Dr. Garton included language similar to the "Version Fourteen" statement to his investigator, but it added more details. Dkt. No. 347-9 at 13. Petitioner stated that he asked Doreen why she did not go into the pool and she responded "get the hell out of here." *Id.* Petitioner stated that he thought he was able to carry out the murder by projecting himself into an "other" who was doing everything as he watched. Petitioner then said that it was a release of pent up emotion. According to Petitioner, he stopped attacking when the fetus expelled, then resumed the attack and left shortly after. Petitioner stated that he felt bad for Doreen at times, but said that there was no doubt in his mind that Paul's death was her fault. Petitioner believed Doreen should have looked in the pool sooner and that she knew the pool was dangerous. In his "Version Sixteen" statement to Dr. Garton, Petitioner again stated that he chose Halloween because he thought he could get away with it. In addition, Petitioner stated that he did not know Charles was not home. Petitioner knew Charles could have possibly killed him, but he was happy to kill Doreen first.

In his undated "Version Seventeen" statement to Dr. Benson, Petitioner said that he had occasional fantasies of Charles and Doreen's death. Dkt. No. 347-9 at 14. He could not be happy with Paul dead and Doreen responsible, so he decided to go see if she was home. Petitioner stated that he did not know if he would kill her. He stopped stabbing her after she vomited blood. In

31

another interview with Dr. Benson, Version Eighteen, Petitioner additionally stated that Petitioner wanted to find out why "they" killed Paul and wanted them dead, but did not think he could kill anyone. Petitioner got paranoid and purchased a gun because he thought he would be their next target; he also believed his attorney wanted to kill him. Petitioner told Dr. Benson that Doreen had night clothes on during the attack. Petitioner also claimed that Charles appeared happy at Paul's funeral. Petitioner stated that he saw water before the fetus came out of Doreen.

During his sodium amytal interview, memorialized by Dr. Cohen as "Versions Nineteen and Twenty," Petitioner again stated that he chose Halloween because it was the best time to commit the murder and get away with his plan. Dkt. No. 347-9 at 14. Petitioner dressed in his wolf mask and went to Doreen's home. He was not 100% sure she would be there, but he was hoping that she would be. Petitioner repeated details about Doreen opening the door, his words to her ("you killed my boy") and her response to him ("I didn't mean to"), his surprise at seeing that she was pregnant, and his denial of hurting the fetus after it was expelled from Doreen. This time, Petitioner stated that he thought Doreen was lying to him when she said that she did not mean to kill Paul. Petitioner stated that he hated Doreen very much and told Dr. Benson that he did not remember jumping into the home. Petitioner said that he was not able to see color throughout the attack, but described that Doreen was wearing a pink nightgown. He repeated his story that he saw Doreen and Charles once after the trial while they were in a truck and reiterated that he wanted to kill Charles, too. According to Petitioner, Charles was "possibly responsible" for Paul's death. *Id.* at 22.

Petitioner told Dr. Benson that he thought about being killed while he was attacking Doreen, but did not think about his own life. Dkt. No. 247-9 at 15. He did not know that Charles was not home. For all he knew, Charles was in the back and "could have gotten a gun and shot [him]." *Id.* at 21. Petitioner, however, was just happy to attack Doreen first. He also said that he

32

did not think about what effect Doreen's death would have on her daughter, Deanna. Petitioner

did not think Deanna's life was in good hands. Petitioner denied seeing Deanna, but said that he

would not have hurt her. Petitioner stated that he thought that no one was home. Petitioner also

told Dr. Benson that he blamed the justice system. Dkt. No. 247-9 at 16. He stated that Doreen

was at fault and that, had the system put her behind bars, "nothing further would have happened."

*Id.* Paul was the most important thing in his life. Despite his statement that Doreen was at fault,

Petitioner stated that he felt he failed Paul by not making Doreen put in a barrier for the fence.

Petitioner also stated that he would not have killed Doreen if he had known then what he knew

"today." He insisted that he would not want to hurt someone who was pregnant.

During a September 6, 1988, interview with a probation officer, Petitioner provided

another account of the crimes and what he believed led to Doreen's killing ("Version Twenty-

One"). Dkt. No. 247-9 at 23. Petitioner told the probation officer that he fantasized about putting

weights on Doreen's legs and forcing her to jump in the pool at gunpoint. He also fantasized

about drowning Doreen in the toilet bowl. Petitioner reiterated his fantasy of dropping Doreen

and Charles in the sea, telling the probation officer that sewing the body bags and building the

"coffins" were all part of that fantasy and a way of letting off pressure. *Id.* Petitioner believed

that Doreen and Charles were laughing at him behind his back, that even though Petitioner had

lost a child, they were starting a new family. They did not care about him—they never sent

Petitioner anything although he bought them Christmas gifts and sent Doreen cards for her

birthday.

Petitioner again blamed the justice system for his position. Dkt. No. 247-9 at 23. He told

the probation officer that he thought that he would have been able to get through his grieving

process had the justice system helped him, i.e., helped him win the civil suit against Doreen and

Charles. Petitioner thought the win would have allowed him to get on with his life and put Paul's

33

death in perspective. He felt that his case should be a lesson to judges that they should not accept a jury's decision when they know it is wrong. Petitioner thought that he was a good person if the probation officer did not consider October 31, 1984. He did not think that locking him up did any good for society, as he did not see himself as dangerous or violent and the crime was one "of passion." *Id.* Petitioner told the probation officer that his case should not be a death penalty case because he was hurt first, and at best felt that both matters should be Second Degree Murder; in truth, he saw his case as a Manslaughter case. Petitioner said that Doreen "deserved it."

Petitioner also told the probation officer that he did not torture Doreen and that she was not yelling in pain. Dkt. No. 247-9 at 24. Petitioner said that Doreen was not conscious for more than one minute. When asked about the blood sprayed through the entry way, walls, and ceiling, Petitioner stated that Doreen might have laid there for ten minutes or more with her heart pumping blood and spraying the room after he left. He again described getting rid of incriminating evidence, telling the officer that he was "amazed" he had carried out the killing when he got home. *Id.* Petitioner was surprised that police showed up so quickly and when they arrested him. Petitioner said that he wished he had not killed Doreen mainly because he hurt his parents by doing so. Dkt. No. 247-9 at 24. Petitioner also felt badly for Deanna and Doreen's parents. Petitioner believed that the killing did not do any good for anyone, even himself, because he cried more than he used to after Paul died. Petitioner stated that the gas chamber might be a relief because the pain would be over.

Dr. Cohen described his own February 12, 2014, interview with Petitioner as "Version Twenty-Two." Dkt. No. 247-9 at 24. Petitioner told Dr. Cohen that he knew he was not going to drown Doreen, but that he did not have much of a plan when he showed up at Doreen's door on the date of the murder. Petitioner had a hatred for Doreen. He had been thinking about the crimes for approximately one or two weeks. Petitioner described taking the machete, gun, and small

34

knife to Doreen's house. Petitioner told Dr. Cohen that he took two masks and that, after crossing the bridge, he planned to take one mask off so that he would have a different mask on. Petitioner described attacking Doreen in substantially similar fashion as he had before. Petitioner said that, after he cut his fingers, he tried to prevent blood from dripping. After he arrived back home on the night of the killing, Petitioner put his gun back to where he normally kept it and put away the small knife. He disposed of the machete and his shoes in case he had left any footprints. He then tried to fall asleep, but police arrived at his home and asked if they could look around. Petitioner allowed them to walk into his home. When police found blood and saw that Petitioner had bandaged his hand, they arrested him.

Finally, Dr. Cohen described what he called "Version Twenty-Three" of Petitioner's accounts of the crimes. Dkt. No. 247-9 at 26. This account was given to him by Petitioner on the same date as "Version Twenty-Two." Petitioner described arriving at Doreen's home and ringing the doorbell. He did not see the truck there and noticed that the lights were out. When Doreen opened the door, she stuck out her face and saw Petitioner with the machete, so she turned and started running. Petitioner described running after her and swinging at her, then Doreen falling. Petitioner stated that he was not swinging at any particular place, but was just swinging as hard as he could. Petitioner said that there was an explosion when the fetus popped out. Petitioner again described being shocked, telling Doreen that she "killed [his] boy," and Doreen telling him that she did not mean to. Petitioner believed Doreen was lying and he began attacking her again. Petitioner then cut himself with the machete, which caused him to drop it. When he tried to pick the machete up, he could barely hold it. Nevertheless, Petitioner continued trying to kill Doreen because he hated her. Once Petitioner saw Doreen throw up blood, he thought that Doreen was dead or just about there, so he grabbed his bag and walked out, closing the door behind him.

According to Dr. Cohen, Petitioner's actions and statements showed he was conscious of

his guilt. Petitioner wore rubber gloves and actively tried to avoid leaving footprints in Doreen's blood, destroyed or disposed of incriminating evidence, denied committing the crime to police, gave police alternate theories of who could have killed Doreen, and explicitly acknowledged that he was trying to get away with the killing by carrying it out on Halloween and concealing evidence. Dkt. No. 347-9 at 27-28. Petitioner's allocution, in which Petitioner apologized for committing the killings, also supported Dr. Cohen's theory. Dr. Cohen noted that Petitioner also acknowledged that he should be punished for committing two murders and stated that killing was a very serious crime.

Based on statements by individuals other than Petitioner, Dr. Cohen disputed Petitioner's statements that he did not know Doreen was pregnant and that he did not cut up the fetus after it was expelled from Doreen. Dkt. No. 347-9 at 29. Dr. Cohen also questioned Petitioner's statements that his crime was one of passion with no premeditation and Petitioner's theory that he killed Doreen because he believed that his killing of Doreen was an act of retribution for her killing his son. *Id.* at 29-30. Instead, Dr. Cohen believed that Petitioner's decision to kill Doreen and her fetus was "premeditated, deliberate, and motivated by revenge, anger, and hate."

Dr. Cohen went on to list various facts and statements to support his theory, including Doreen's affairs while they were married; that Petitioner and Doreen fought constantly over money; that Petitioner described his hatred for Doreen because he "gave, gave, gave, [and she] took, took, took," treated him badly, and took his son's life (*see id.* at 31); Petitioner's and other witnesses' descriptions of Doreen not reciprocating Petitioner's affection for her during and after their marriage; Petitioner and Doreen's squabbles over child support payments and funeral expenses after Paul died; Petitioner's statements to Doreen in a letter he sent after Paul's death, telling her that he felt cheated by her in their marriage and that Paul's death meant they had no more ties; Petitioner's threatening statements, such as "I'll get them," and "they're going to pay

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

for it," as he was being thrown out of the Erberts' home on the day of Paul's funeral (*see id.* at 32); witness' descriptions of Petitioner's hatred toward Doreen as "strong," "overwhelming," "deep," and "mortal" (*see id.*); Petitioner's statement that Doreen had taken advantage of him over the years and that he was planning to take a stand; Petitioner's remark that Doreen had not "suffered enough" when a coworker remarked that she probably suffered from Paul's death, too (*see id.* at 33); Petitioner's statement that he wanted to get back at Doreen; Petitioner's various plans to kill Doreen and Charles; Petitioner's advance purchase of the machete; evidence found in Petitioner's residence, including two anchors, two body bags, two homemade coffins, a nautical chart with depths of the San Francisco Bay and the central California coast, and a 1982 Penthouse magazine featuring an article entitled "The Farce of Courtroom Psychiatry: Murder by Insanity" placed on top of a stack of 1984 issues (*id.*); reports that Doreen was receiving threatening telephone messages from a disguised male voice stating "I'm going to kill you" and "I'm going to close your business down," for which Doreen assumed Petitioner was responsible (*id.* at 34); Petitioner's statements to Twila Hendrickson Mejia that Doreen had gotten pregnant again; the nature of the injuries to Doreen and her fetus; and Petitioner's various statements about the series of bad or unfair events happening prior to his killing of Doreen, i.e., that he had been demoted at work, suspected that he had herpes, and that he had broken up with his girlfriend. *Id.*

Dr. Cohen diagnosed Petitioner with Adjustment Disorder with mixed anxiety and depressed mood. Dkt. No. 247-9 at 38. The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) defines Adjustment Disorder as "the presence of emotional or behavioral symptoms in response to an identifiable stressor . . . [which] may be a single event (e.g., a termination of a romantic relationship), or there may be multiple stressors (e.g., marked business difficulties and marital problems)." *Id.* at 38-39. Dr. Cohen believed that Petitioner manifested some depressive and anxiety symptoms as a consequence of the legal proceedings and his

37

incarceration.

Dr. Cohen also diagnosed Petitioner with an Other Specified Personality Disorder with mixed antisocial and borderline features. "Personality disorders involve a pattern of inflexible and recurrent maladaptive behavior that is not a mental disease." Dkt. No. 247-9 at 39. According to Dr. Cohen, the DSM-5 defines antisocial personality disorder as a "pattern of disregard for, and violation of, the rights of others." *Id.* Dr. Cohen stated that Petitioner's antisocial personality features include deceitfulness, impulsivity, and a failure to conform to social norms with respect to lawful behaviors, and provides a list of Petitioner's actions supporting his diagnosis, including the fact that he murdered Doreen and her fetus, that Petitioner tried to use force to have sex at least once, and that Petitioner frequented prostitutes and used cocaine and methamphetamine. Dr. Cohen also provided a list of Petitioner's actions that support his diagnosis of borderline personality disorder, which the DSM-5 defines as a "pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity." *Id.* at 40.

According to the DSM-5, "[t]hese individuals may suddenly change from the role of a needy supplicant for help to that of a righteous avenger of past mistreatment." *Id.* Petitioner's borderline personality features include paranoid ideation, sudden and dramatic shifts in his view of others, inappropriate and intense anger, and dysphoria. As examples, Dr. Cohen listed that Petitioner was obsessed with being in a relationship with women, that Petitioner was known to be sensitive to criticism and was rumored to lose control, and listed several instances in which Petitioner lost his temper or otherwise threw loud or violent fits in anger over not being able to get what he wanted. *Id.* at 40-42.

Dr. Cohen disagreed with Dr. Benson and Dr. Woods' diagnoses of delusional disorder and major depressive disorder, giving various examples of Petitioner's behavior or statements that he felt contradicted those diagnoses. Dkt. No. 247-9 at 35-38. As to Major Depressive Disorder,

38

Dr. Cohen noted that Petitioner's contemporary diagnosis after Paul's death was not of depression, but "bereavement" and "grief," and that Petitioner had consistently reported improvement of his mental health after his first visit to Kaiser. *Id.* at 35. As to Delusional Disorder, Dr. Cohen noted that Petitioner's "fixed" delusion was not fixed, as shown by Petitioner's statements to police that Paul's death was accidental, Petitioner's statements to his investigator that he was no longer sure that Doreen killed Paul, and his statements to Dr. Cohen that he could accept that Doreen was negligent if the civil jury had so found. *Id.* at 35-36. Dr. Cohen additionally cited psychiatric evaluations that Petitioner underwent in November 1984, which diagnosed Petitioner with "probable mixed character disorder with narcissistic and sociopathic components, over-controlled personality style' and which did not indicate any signs of a formal thought disorder or reveal any paranoid ideas, as well as various psychiatric evaluations of Petitioner from: July 1985 (no symptoms of psychotic disorder, diagnosis of adjustment disorder with depressed mood and mixed character disorder); September 1988 (no signs or symptoms of psychotic or any other mental disorder): December 1988 (finding Petitioner "presently sane within the meaning of California statute"); January, April, and August 1989 (no signs of symptoms of psychotic or mental disorder); November 1989 (diagnosis of adjustment disorder with depressed mood and personality disorder with borderline narcissistic and avoidant features); and Dr. Cohen's February 2014 examination (no clinical psychopathology or psychotic symptoms). *Id.* at 37-38.

Dr. Cohen concluded that Petitioner did not suffer from a mental disease, that Petitioner was not insane at the time of the murders, and that Petitioner indeed premeditated the crimes and acted with malice aforethought. Dkt. No. 247-9 at 42-43.

**l. Lay Witnesses**

Petitioner submitted the declarations of forty-six lay witnesses. *See* Dkt. No. 299-10 to 299-56. Some of the lay witnesses were called as witnesses by both parties during Petitioner's

39

trial, including Gerald Ceglio, Ronald Christian, Enoch Cole, John Golden, Ted Grish, James Hall, Kenneth Marquardt, Elizabeth Ross, Eric Steinhauff, Barbara Thorn, and Robert Webb. Two declarations were from jurors. Dkt. No. 299-42 & 299-49. The declarations also included one declaration from Petitioner's civil attorney and one from Petitioner's trial attorney. *See* Dkt. No. 299-28 & 299-47.

Petitioner's lay witnesses described aspects of Petitioner's background throughout various stages in his life, including his childhood, adolescence, and adulthood, and were largely consistent with previous witnesses' reports of Petitioner's background and characteristics. Most of the witnesses noted that Petitioner had a hearing problem and a stutter or speech impediment, that Petitioner was chubby or fat as a child, that Petitioner was viewed as "slow" by many of his peers, and was bullied by others. Many also noted that Petitioner was a loner, shy, introverted, socially awkward or inept, and often "sad." *See, e.g.*, Dkt. No. 299-10 to 299-14; 299-18 to 299-23; 299-45 to 299-46; 299-51 to 299-55. The witnesses also agreed that Petitioner was a good father who appeared to love Paul and, while they were married, Doreen. Several of the lay witnesses declared that Petitioner was nice, honest, trustworthy, kind, responsible, docile, a good friend, and "not violent." Dkt. No. 299-10; 299-13 to 299-17; 299-19; 299-22 to 299-25; 299-31 to 299-32; 299-40; 299-50; 299-52 to 299-53; & 299-55. Petitioner's coworkers appeared to agree that Petitioner was a good worker and a perfectionist.

Some of Petitioner's lay witnesses also stated, however, that Petitioner had a bad temper and listed several occasions during which Petitioner overreacted at minor incidents either by yelling, ranting, and "raving"; by throwing or hitting items; "hacking" at a tree with a golf club; or, in one instance, by physically assaulting his brother John. Petitioner's overreactions happened after he dropped a sandwich, hit a bad shot during a golf game, had trouble with a craft project, got into a minor fender bender, gave a parking attendant the wrong amount of cash, lost a woman's

40

phone number, could not find a date while he was skiing with a friend, and got an answer wrong during class. The tantrums also occurred after one of Petitioner's friends continued kicking Petitioner's desk after Petitioner asked him to stop, when a coworker asked Petitioner how he was doing on what happened to be the anniversary of Paul's death, and when Petitioner's brother, John, bit one of their cousins. *See* Dkt. No. 299-13 to 299-14; 299-17 to 299-18; 299-22; 299-26; 299-35; 299-38 to 299-39; 299-43; 299-45; & 299-56. Finally, most of the witnesses who spent time with Petitioner during his adulthood stated that Petitioner was devastated by Paul's death, upset about losing his civil trial, and absolutely blamed Doreen for Paul's death. They also described a transformation in Petitioner's affect after Paul's death, often describing him as depressed. One of the lay witnesses, John McDowell, noted that Petitioner's family, on the maternal side, had a history of mental illness. Dkt. No. 299-43.

## II.    DISCUSSION

### a. Standard of Review

A district court may not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In determining whether a petitioner is entitled to relief under this provision, a federal court's review "is [generally] limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170 (2011).

The "contrary to" and "unreasonable application" prongs of section 2254(d)(1) have separate and distinct meanings. *See Williams v. Taylor,* 529 U.S. 362, 404 (2000). A state court's

41

decision is "contrary to" clearly established U.S. Supreme Court law if that decision fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. *Id.* at 412–13. A decision is an "unreasonable application" of U.S. Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Importantly, " 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.' " *Harrington v. Richter,* 562 U.S. 86, 101 (2011) (quoting *Williams,* 529 U.S. at 410). A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness." *Id.* (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)). Holdings of the U.S. Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under section 2254(d)(1). *See Williams,* 529 U.S. at 412; *see also Lopez v. Smith,* —— U.S. ——, 135 S.Ct. 1, 4 (2014) (per curiam) ("AEDPA permits habeas relief only if a state court's decision is 'contrary to, or involved an unreasonable application of, clearly established Federal law' as determined by this Court, not by the courts of appeals"). While a federal court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers,* 569 U.S. 58, 64 (2013) (per curiam), "[c]ircuit precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Lopez,* 135 S.Ct. at 4 (internal quotation marks omitted).

To find under section 2254(d)(2) that a state court's decision was based on "an unreasonable determination of the facts," a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the

42

finding is supported by the record before the state court." *Hurles v. Ryan,* 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted), *cert. denied,* –––– U.S. ––––, 135 S.Ct. 710 (2014). In other words, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow,* –––– U.S. ––––, 134 S.Ct. 10, 15 (2013) (internal quotation marks omitted). That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox,* 366 F.3d 992, 1001 (9th Cir. 2004), abrogated on other grounds in *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014). .

Under AEDPA, a federal court reviews "the last reasoned state-court decision." *Castellanos v. Small,* 766 F.3d 1137, 1145 (9th Cir. 2014). In a case where "no state-court decision furnishes a basis for the state court's underlying reasoning," a federal court's "duty under AEDPA is not absolved." *Murray v. Schriro,* 745 F.3d at 996. Rather, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter,* 562 U.S. at 98. To determine whether a petitioner has met this burden, a federal court must ask "what arguments or theories supported or, . . . could have supported, the state court's decision" and decide "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme Court]." *Id.* at 102. Thus, when a state court does not supply reasoning for its decision, a federal court "must engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable." *Castellanos,* 766 F.3d at 1145 (internal quotation marks omitted). Critically, independent review of the record "is not a *de novo* review of the constitutional question," but rather the only way a federal court can determine whether a silent

43

state court decision is objectively unreasonable. *Murray,* 745 F.3d at 997.

In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's constitutional claim "*de novo.*" *Hurles*, 752 F.3d at 778. If constitutional error is found, however, habeas relief is warranted only if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Brecht,* 507 U.S. at 637.

### b. § 2254(d) and *Pinholster*

As a threshold matter, Petitioner argues that the Court should consider his claims *de novo* because the California Supreme Court wrongfully prevented him from developing the "new" evidence in support of his claims and, as a result, issued a decision based on an unreasonable determination of the facts in light of Petitioner's pleadings. *See* Pet. Br. at 28-35. Respondent argues that relitigation of the merits is precluded by 28 U.S.C. § 2254(d) and that consideration of new evidence is barred by *Pinholster*, 563 U.S. 170. *See* Resp. Br. at 51-63.

This Court first notes that Petitioner cannot establish a violation of § 2254(d)(2) based on a general grievance that the state court must have resolved factual disputes without a hearing. Rather, Petitioner must establish that the state court unreasonably determined the facts because no other reasonable explanation can account for the state court's decision regarding a particular claim. *Richter*, 562 U.S. at 101; *see Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012) (stating that there is no per se rule that § 2254(d)(2) requires that a state court conduct an

evidentiary hearing to resolve every disputed factual question). Here, as will be explained, the Court concludes that Petitioner has not shown that the California Supreme Court's factual determinations were unreasonable under § 2254(d)(2) and, further, that Petitioner's claims would be unmeritorious even if this Court were to consider Petitioner's "new" evidence *de novo*. While Respondent is correct that that § 2254(d) generally bars the Court from granting Petitioner relief based on his new evidence, section 2254(b)(2) allows the Court to consider such evidence when the Court finds that a claim has no merit. *See* § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available . . .").

While the Court recognizes that exhaustion generally serves principles of comity between state and federal courts, here, where the "new" evidence is cumulative in nature to the evidence provided to the state court, and Court has determined that Petitioner's claims are unmeritorious, federal-state comity is less consequential. *See Picard v. Connor*, 404 U.S. 270, 277-78 (1971) (claims exhausted if petitioner fairly presents legal theories and operative facts to state court). The Court therefore consider the evidence produced by the parties during, and in preparation for, the 2014 evidentiary hearing.

### c. Ineffective Assistance of Counsel

Petitioner asserts in Claims 3, 11, and 17 that trial counsel was ineffective at the guilt and penalty phases of trial. *See* Fed. Pet. at 25, 93, 135. The clearly established federal law applicable to these claims is set out in *Strickland v. Washington,* 466 U.S. 668 (1984). In *Strickland,* the U.S. Supreme Court held that ineffective assistance of counsel is cognizable as a denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel. *Strickland*, 466 U.S. at 686. To prevail on an ineffective assistance of counsel claim, a petitioner must establish that: (1) his counsel's performance was deficient, i.e., that it fell below an

45

"objective standard of reasonableness" under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688-94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Ultimately, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances. *Id.* at 689 (internal quotation marks omitted). "In assessing adequacy of representation, '[the Court] is required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as he did.' " *Gallegos v. Ryan*, 820 F.3d 1013, 1030 (9th Cir. 2016) (citing *Pinholster*, 563 U.S. 170).

A "doubly" deferential standard of review is appropriate in analyzing ineffective assistance of counsel claims under AEDPA because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential." *Richter,* 562 U.S. at 105 (internal quotation marks omitted). When section 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### d. Guilt Phase: Claim 3

Petitioner claims that trial counsel was constitutionally ineffective by failing to enter a plea of not guilty by reasons of insanity, violating Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *See* Fed. Pet. at 25. Petitioner contends that he was prejudiced by counsel's ineffectiveness because the jury would have found him insane had counsel pursued that defense. Respondent asserts that trial counsel was not ineffective because he made a reasonable strategic choice and because, even with the benefit of the new evidence submitted by Petitioner, Petitioner

46

has not established that he was insane at the time of the crimes. Resp. Br. at 47. This claim was denied by the California Supreme Court as untimely, successive, and on the merits. *Dennis (William Michael) on H.C.* (S099587, November 27, 2002). Petitioner's claim must be evaluated in light of California's adoption of the *M'Naghten* standard—"that every man is to be presumed to be sane, and . . . that to establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong"—in criminal cases. *M'Naghten's Case*, 10 Clark & Fin. 200, 210 (1843); *see Knowles v. Mirzayance*, 556 U.S. 111, 125 (2009).

Petitioner makes several arguments in support of this claim. First, Petitioner contends that counsel was ineffective because he did not investigate the possibility of entering an insanity plea. Fed. Pet. at 27. Petitioner also argues that counsel's choice of defense was not a trial strategy because trial counsel made only a cursory and uninformed judgment call in deciding not to pursue an insanity defense, likening counsel's conduct to the attorney's conduct in *United States v. Kauffman*, 109 F.3d 186 (3rd Cir. 1997). Fed. Pet. at 28. In *Kauffman*, the defendant, Kauffman, asked the court to vacate his guilty plea based on ineffective assistance of counsel. Kauffman was arrested for selling guns two days after he was released, against the advice of two treating psychiatrists, from an involuntary psychiatric hold. Immediately after his arrest, Kauffman was examined by a psychiatrist who prepared a report stating that he was "undoubtedly psychotic." *Id.* at 187. Sometime later, but before Kauffman pleaded guilty, the psychiatrist wrote a letter informing Kauffman's attorney that he believed Kauffman was "manic and psychotic 'at the time of the committing of the crime.' " *Id.* at 188. Kauffman's attorney ignored the letter and advised the defendant to plead guilty. The Third Circuit Court of Appeals reversed the district court's

order denying the defendant's request to withdraw his plea after learning that Kauffman's attorney, despite admitting that he received the letter from the psychiatrist, did not conduct any pretrial investigation into the facts and law of an insanity defense. *Id.* at 190. Such a failure to investigate, the court reasoned, deprived Kauffman of meaningful representation as required under the Sixth Amendment.

Petitioner's reliance on *Kauffman* is misplaced. The attorney in *Kauffman* admitted that he did not bother looking into an insanity defense despite being presented with an expert's opinion that his client was insane at the time of the crimes. *Kauffman*, 109 F.3d at 191. Here, the California Supreme Court had access to evidence reasonably showing that Petitioner's trial counsel did conduct such an investigation. Petitioner's state habeas record included Dr. Benson's trial testimony that counsel asked him to evaluate Petitioner with a special focus on the night of the crimes and that counsel provided Dr. Benson numerous items to review, which Dr. Benson listed in his testimony. Dkt. No. 300-40 at 3536 & 3550-51. Dr. Benson's testimony also made reference to the fact that at least three other mental health experts had evaluated Petitioner, including Dr. French, Dr. Stephenson, and Dr. Garton. Finally, the state habeas record appended Dr. Garton's report, which included a statement that counsel engaged him to conduct a psychological evaluation pursuant to California Evidence Code §1017 (allowing court-appointed psychiatrists to retain privilege when they have been hired to advise the defense on mental defenses and whether a defendant should enter an insanity plea) (Dkt. No. 300-30, Exh. 28 at 2); trial counsel's letter to Dr. Garton indicating that he wanted Dr. Garton to "evaluate [Petitioner's] present condition and his condition at the time of the alleged homicide to determine whether or not there are any mental defenses, which [counsel] should raise and assert at trial" (*id.* at 7); and Dr. French's letter to the Santa Clara Public Defender stating that while it was possible that Petitioner could have multiple personalities disorder, Petitioner's current psychiatric status was

48

"essentially within normal limits" (Dkt. No. 300-29, Exh. 27 at 479). Moreover, Petitioner has introduced no evidence indicating that Petitioner's experts sought more information from counsel, that counsel ignored their requests for information, or that counsel failed to discuss his theory of the case with his experts. Petitioner's case thus differs from *Kauffman* in virtually every significant respect. Based on the record showing that trial counsel sought out mental health diagnoses, gave his experts substantial materials to review, and the evidence showing that none of Petitioner's pretrial experts made a finding of insanity, the California Supreme Court reasonably could have concluded that Petitioner failed to show that counsel was ineffective in failing to investigate entering an insanity plea. *Richter*, 562 U.S. at 101.

Petitioner's claim also fails under *de novo* review. The supplemented record shows that Petitioner's trial counsel not only considered insanity jury instructions and law related to California's use of the *M'Naghten* test for insanity but also sought guidance as to this point from Dr. Benson, Dr. Stephenson, Dr. Garton, and at least one additional expert as to whether an insanity plea would be appropriate. *See* Dkt. No. 388 at 134-36 (describing trial counsel's letters to Dr. Benson seeking opinion that Petitioner suffered from mental disease or disorder at time of murder and seeking that Dr. Benson testify that Petitioner could not deliberate killing Doreen); Dkt. No. 139, Exh. 5 at 10 (memorandum indicating that trial counsel sent Dr. Benson jury instructions for murder, insanity, and diminished actuality); Dkt. No. 139, Exh. 4 at p. 6 (letter from trial counsel to Dr. Stephenson asking him to consider how Petitioner's "unresolved grief affected his mental condition and sanity at the time of the homicide," and attaching insanity instruction); Dkt. No. 300, Exh. 28 at 1 (Dr. Garton's report for psychological evaluation to aid defense counsel "pursuant to Section 1017" of the California Evidence Code); Dkt. No. 139, Exh. 5 (trial counsel's letters to Dr. James Missett seeking a psychological evaluation of Petitioner). The record also contains evidence that in addition to reaching out to various mental

49

health experts, trial counsel reviewed several articles about insanity and mental health diagnoses, including an article on the use of a PTSD diagnosis in an insanity defense and an article about the role of grief in affecting state of mind.  *See* Dkt. No. 139, Exh. 4 at 27-43.  Trial counsel's research into the law surrounding an insanity defense, as well as his consultations with various mental health experts seeking diagnoses of Petitioner at the time of the crimes, do not show the lack of investigation that Petitioner alleges.  Taking into account counsel's active consideration of an insanity defense, consultation with several experts, and ultimate inability to obtain any findings of insanity from his experts, the record shows that counsel reasonably could have chosen not to pursue an insanity defense.  *See Hendricks v. Calderon*, 70 F.3d 1032, 1037-38 (9th Cir. 1995) (the court could "not condemn as incompetent an attorney's decision not to pursue a mental defense where two experts concluded that the defendant was sane and a third expert could not reach a conclusion").

In a further attempt to paint trial counsel's investigation as limited or incomplete, Petitioner's witnesses imply in their declarations, which they wrote in collaboration with Petitioner's federal habeas attorneys, that even if trial counsel did investigate, he failed to provide his experts with enough information to enable them to make findings of insanity.  By the experts' own testimony, however, it does not appear that counsel sent only "cursory" or "incomplete" materials to the experts.  *Compare* Dkt. No. 299-1 at 4-6 (Dr. Benson's declaration stating that interviews and other materials sent by trial counsel were "brief," "narrow," and did not include "complete" social history) *with* Dkt. No. 388 at 173-74 (Dr. Benson's testimony that he did not recall complaining about the quality or quantity of materials provided to him and admitting that he testified at guilt phase that he was provided adequate history, information, and records) & *id.* at 170 (Dr. Benson calling mitigation specialists' report, which counsel apparently sent to him prior to trial, the "most complete psychosocial history" of Petitioner he had seen); *compare* Dkt. No.

50

299-6 (Dr. Stephenson's declaration stating that he received "limited" materials from trial counsel) *with* Dkt. No. 388 at 101 (Dr. Stephenson's testimony admitting that materials sent by trial counsel were "extensive" in scope and that trial counsel sent a letter offering to provide more information); *see also* Dkt. No. 299-3 at 9 (letter from trial counsel to Dr. Garton stating that he and his investigator would "do whatever [Dr. Garton] need[ed] to complete [his] review" of Petitioner's case). The Court also notes that several of the lay witnesses who supplied new declarations either gave interviews to the defense prior to trial or simply confirmed descriptions of Petitioner supplied by other witnesses. In fact, during the hearing before this Court, Dr. Benson admitted that such interviews, albeit not given under the penalty of perjury, were given to him to review prior to his evaluation. *See* Dkt. No. 388 at 164-166. Some of the witnesses' statements were also described by mitigation specialists in their sentencing report—another document reviewed by Dr. Benson and Dr. Stephenson. *See* Dkt. No. 139, Exh. 16.

In addition, none of the experts appear to have asked trial counsel for more materials. Absent a request for information from an expert, counsel does not have a duty "to acquire sufficient background material on which an expert can base reliable psychiatric conclusions. . . ." *Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir. 1997); *see Turner v. Calderon*, 281 F.3d 851, 876-77 (9th Cir. 2002) ("Failure to provide a psychologist with facts about a defendant's family history ordinarily cannot support a claim of constitutionally ineffective assistance"). Trial counsel cannot be faulted for failing to track down every record that might possibly relate to the defendant's mental health. *Bloom*, 132 F.3d at 1278. As trial counsel appears to have (1) provided his experts with various documents, including interviews, medical records, police reports, and a sentencing report by two mitigation specialists, which report detailed significant events in Petitioner's life and summarized statements from various witnesses who knew petitioner; (2) corresponded with the experts about strategy and direction of their reports;

51

and (3) offered to send more materials should the experts require them, the Court cannot find that trial counsel's conduct fell below "an objective standard of reasonableness" under these circumstances. *Strickland*, 466 U.S. at 688.

Petitioner argues alternatively that trial counsel was ineffective because there already was evidence that Petitioner was insane and that, because trial counsel sought a lesser conviction based upon mental disease, an insanity plea would have been consistent with trial counsel's defense. Fed. Pet. at 27-28; Pet. Reply Br. at 9. Petitioner also argues that his obvious signs of insanity should have led counsel to investigate whether he was indeed insane. However, while the various reports submitted by Petitioner several years after his trial purport to show a loud and consistent message that Petitioner was pathologically delusional at the time of the crimes, which may in turn show that Petitioner might have pleaded insanity (*see People v. Skinner*, 39 Cal.3d 765 (1985) (insanity may be proven if the record contains evidence showing that defendant was incapable of understanding that an act was morally wrong even if he knows the act was unlawful)), the Court must consider whether counsel's actions were reasonable under the circumstances at the time of trial. *See Premo v. Moore*, 562 U.S. 115, 125 (2011) ("habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel").

As already noted here, none of the reports or correspondence submitted to trial counsel by his experts, including Dr. French, Dr. Stevenson, Dr. Garton, and Dr. Benson, made a finding that Petitioner was insane at the time of the crimes despite trial counsel's correspondence suggesting a potential insanity defense based upon their opinions and reports. Moreover, as noted in Dr. Cohen's report, various mental health professionals who evaluated Petitioner prior to trial reported that Petitioner was not insane. *See* RT 3606 (admission by Dr. Benson that Petitioner's therapist, who saw Petitioner several times immediately after Paul's death, found that Petitioner's

52

grieving, bereavement, and hostility toward Doreen fell within normal levels); Dkt. No. 247-9 at

37-38 (July 1985 evaluation finding no symptoms of psychotic disorder; September 1988

evaluation finding no signs or symptoms of psychotic or any other mental disorder; December

1988 evaluation finding Petitioner "presently sane within the meaning of California statute";

January, April, and August 1989 evaluations finding no signs of symptoms of psychotic or mental

disorder; November 1989 evaluation tendering diagnosis of adjustment disorder with depressed

mood and personality disorder with borderline narcissistic and avoidant features). Given the

various reports stating that Petitioner was not insane, as well as counsel's well-rounded

investigation of Petitioner's mental health issues and circumstances, Petitioner's counsel did not

have a duty to shop around for experts until he found one to testify that Petitioner was insane. *See*

*Hendricks v. Calderon*, 70 F.3d at 1037-38 (attorney not incompetent for failing to pursue more

psychological opinions after consulting with three others who disagreed on whether petitioner was

insane).

      As to Petitioner's second contention, that an insanity plea would have been consistent with

trial counsel's defense seeking a lesser conviction based upon mental disease, the Court notes that

Petitioner's argument is essentially that counsel was ineffective because he had nothing to lose by

entering an insanity plea. The Supreme Court has held that a failure to enter an insanity plea

merely because the defense has nothing to lose is not a rule "clearly established [under] Federal

law." *Knowles v. Mirzayance*, 556 U.S. at 121-22; *see* Dkt. No. 389 at 396 (Mr. Nolan's

concession that the Sixth Amendment does not require counsel to move through experts until he

finds the one who gives him the answer he wants).

      However, even if the Court were to reviewed Petitioner's argument *de novo* and assume

that counsel had supporting evidence of insanity *before* the trial, the notion that counsel had

nothing to lose is simply not true. As evidenced by Dr. Cohen's declaration and by trial counsel's

53

notations in his file, Petitioner's evidence tending to show insanity would open the door to a plethora of impeachment and the construction of a different picture of Petitioner not as a grieving father, but as a narcissist with a history of loud and violent outbursts far before Paul's death. *See* Dkt. No. 247-9 at 31-40 (Dr. Cohen's report & declaration describing evidence inconsistent with Petitioner's insanity theory). The danger in presenting such a defense while in possession of a multitude of conflicting reports is also evident in the fact that Dr. Benson was extensively cross-examined during trial regarding apparent inconsistencies between his opinion and those of his colleagues, as well as Petitioner's own words and actions, which ultimately damaged the overall impact of Dr. Benson's testimony. *See* RT 3594-3677. These items, which arguably showed that Petitioner had " 'clearly goal-directed behavior;' " such as the various fantasies and partial preparations for some of Petitioner's plans to kill Doreen and Charles, undoubtedly would have been used against any potential experts testifying that Petitioner was insane at the time of the killings. *Knowles v. Mirzayance*, 556 U.S. at 125 (trial counsel not ineffective in rescinding insanity plea when his experts could be severely impeached for overlooking or minimizing facts inconsistent with their diagnoses); *see* Dkt. No. 347-9 at 29-33 (listing Petitioner's statements to others about his feelings toward Doreen and detailing Petitioner's various conceptualized methods of killing Doreen and Charles).

Accordingly, the record suggests that trial counsel's strategy choice, while unsuccessful, was reasonable in light of the information available to counsel at the time of trial. *See Richter*, 562 U.S. at 89 (court cannot "rely[] on 'the harsh light of hindsight' " in finding ineffective assistance of counsel). Petitioner has therefore failed to show that trial counsel's conduct fell below "an objective standard of reasonableness" on this ground as well. *Strickland*, 466 U.S. at 688. As the Court has not found that counsel's performance was deficient, there is no need to move on to the prejudice prong. *Strickland*, 466 U.S. 688-94. The Court concludes that Claim 3

54

is unmeritorious and should be DENIED.

**e. Guilt Phase: Claim 11**

Claim 11 alleges that trial counsel was constitutionally ineffective during the guilt phase by failing to present compelling mental disease evidence that would have negated malice and reduced Petitioner's culpability from murder to manslaughter. *See* Fed. Pet. at 93 (citing Fifth, Sixth, Eighth, and Fourteenth Amendments). This claim was denied by the California Supreme Court as untimely, successive, and on the merits. *Dennis (William Michael) on H.C.* (S099587, November 27, 2002).

Under California law at the time of Petitioner's trial, a defendant's use of mental health evidence during the guilt phase was limited by statute:

> Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged. [¶] Cal. Pen. Code § 28(a). California law's definition of malice requires that a person manifest a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears. . . When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice.

Cal. Pen. Code § 188.

Here, Petitioner argues that trial counsel was ineffective in failing to present adequate evidence of his mental disease or defect during the guilt phase of trial so that he would have been entitled to an instruction on manslaughter. Fed. Pet. at 93. In support of his claim, Petitioner points to various actions, or purported inactions, by trial counsel. The underlying theme of Petitioner's list of trial counsel errors is that trial counsel did not adequately investigate, prepare

55

his experts, or present his experts at trial. *See* Fed. Pet. at 93-98.

As a threshold matter, Petitioner has failed to explain how any of the expert testimony he has elicited and submitted to this Court, or to the California Supreme Court, would negate malice such that Petitioner would have been entitled to a conviction of voluntary manslaughter. *See* Fed. Pet. at 105. Petitioner's diagnosis of Paranoid Delusional Disorder, Persecutory Type, even when taken at face value, would not appear to have precluded Petitioner from being able to form an intent to kill Doreen. As Respondent notes in his post-hearing brief, Petitioner's current mental health defense theory, i.e., that Petitioner operated under a delusion that Doreen had purposefully killed Paul at the time of the murders and that Petitioner therefore felt morally entitled to kill her four years later, appears to establish rather than negate deliberation and malice aforethought under California law because it assumes that Petitioner planned and intended to kill Doreen. *See* Resp. Br. at 48; *see also* Cal. Pen. Code §§ 28 &188.

The record also contains ample other evidence tending to show that Petitioner possessed the requisite intent. For example, Petitioner told Dr. Benson that he purchased the machete because he thought it would be a good weapon to use on Doreen and, on the night of the crimes, Petitioner knowingly packed several weapons into a bag, obscured his face under a mask, and headed to Doreen's home "hoping" that she would be there. *Dennis*, 17 Cal.4th at 498. Petitioner also told various individuals, including Dr. Garton and Dr. Benson, that he chose to kill Doreen on Halloween night because he thought he would have a better chance of getting away with it. Dkt. 347-9 at 13-14. Petitioner does not point the Court to any evidence challenging the weight of the testimony and materials establishing Petitioner's intent except insofar as he appears to be claiming diminished capacity, which was impermissible at the time of trial under California law. *See People v. Elmore*, 59 Cal.4th 121 (2014) (evidence of mental health disease or disorders is limited by rule that " 'the defendant's sanity is *irrelevant* at the guilt phase and evidence tending to prove

56

insanity, as opposed to the absence of a particular mental element of the offense, is

*inadmissible'* ") (emphasis in original). Under these circumstances, the California Supreme Court

reasonably could have concluded that even assuming counsel was ineffective in failing to present

Petitioner's new evidence at trial, Petitioner has failed to show that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland*, 466 U.S. at 694; *see Richter,* 562 U.S. at 101.

Petitioner's claim also fails on *de novo* review. Petitioner argues that trial counsel was

ineffective in evaluating and preparing his experts, citing *Bloom v. Calderon*, 132 F.3d 1267, 1275

(9th Cir. 1997). *Bloom* involved an essentially absentee attorney. Defendant Bloom was accused

of killing his father, stepmother, and stepsister. Bloom's attorney failed to consult with his first

expert, a neurologist, and simply had Bloom transported to the neurologist's office with no context

as to the crimes of which Bloom had been accused or the purpose of the neurological exam. The

neurologist produced an unfavorable report after assuming the purpose of the examination was to

establish whether Bloom suffered from a seizure disorder. *Id.* at 1271.

Bloom's attorney also failed to consult with a second mental health expert until

approximately three weeks before the trial and then failed to send the expert several documents he

requested, including psychiatric, social, and family history information about Bloom. *Id.* at 1271-

72. Instead, Bloom's attorney sent the expert a few documents, including the preliminary hearing

transcript, the unfavorable neurological report, some of Bloom's school assignments, a letter from

Bloom's mother complaining about the attorney's performance at the preliminary hearing, and

some other documents noting some incidents in which Bloom got in trouble, listing some of his

mother's mental health issues, and accusing Bloom's father of being abusive. *Id.* at 1272. Again,

the attorney never provided the second mental health expert with any guidance as to the purpose of

the evaluation or the theory of the case. As a result, the second mental health expert produced an

57

extremely damaging report speculating that Bloom had most likely lied about his reason for killing

his victims and noting that Bloom had a remarkable lack of remorse regarding his act. Although

the second mental health expert later produced a more favorable report, the prosecution impeached

him using his initial unfavorable report at trial. *Id.* at 1273.

Bloom's attorney continued ignoring other experts' requests for information and ignored

numerous frantic calls from a social worker who believed that Bloom desperately needed

psychiatric help. *Id.* at 1274-77. Bloom was convicted and sentenced to death. Based on the

attorney's conduct, the Ninth Circuit held that Bloom received ineffective assistance of counsel.

The court emphasized that the attorney had failed to prepare his experts, had provided only a

cursory amount of information to each of them, had provided the experts no context or direction as

to his theory of the case or the purpose of each evaluation, and, most egregious, ignored the

experts' repeated requests for information about Bloom despite the availability of the information

the experts sought. *Id.* at 1278. The appellate court was unable to ascribe any strategic value to

the attorney's complete lack of action.

Petitioner's case is readily distinguishable from *Bloom*. As discussed previously, the

record here contains substantial evidence showing that trial counsel conferred or corresponded

with each of his potential experts and, when appropriate, explained the facts, his theory of the

case, and even California law as to diminished capacity and diminished actuality. *See* Dkt. No.

388 at 134-36 (noting that counsel asked Dr. Benson to testify that Petitioner suffered from mental

disease or disorder at time of murder and seeking that Dr. Benson testify that Petitioner could not

deliberate killing Doreen); Dkt. No. 139, Exh. 5 at 10 (memorandum indicating that trial counsel

sent Dr. Benson and Dr. Stephenson jury instructions for murder, insanity, and diminished

actuality); *id.* at 6 (letter from trial counsel to Dr. Stephenson asking him to consider how

Petitioner's "unresolved grief affected his mental condition and sanity at the time of the

58

homicide"); *id.* at 20 (letter from trial counsel to Dr. Garton seeking that he evaluate Petitioner's present mental condition and at time of crimes and identify whether he could present any mental defenses); *id.* at 8-9 (letter from trial counsel to Dr. Stephenson explaining diminished actuality defense); *id.* at 2 (letter to Dr. Missett requesting short analysis and report as to whether petitioner's mental disease or disorder "affected him severely enough to negate 'deliberation' "); *id.* at 72-73 (letters indicating trial counsel sent Dr. Garton and Dr. Benson a psychosocial history prepared by two mitigation specialists); *see ante*, at 46-48.

The record also contains evidence that trial counsel repeatedly sent letters to his experts emphasizing his strategy and hopes for their evaluations. Finally, unlike the defendant in *Bloom*, Petitioner has not presented any credible evidence showing that any of his experts sought more information before making their diagnoses. *See Bloom*, 132 F.3d at 1277-78. *Bloom* simply is not controlling here.

Petitioner also argues that counsel was ineffective in failing to recognize Dr. Benson's "weak" testimony. Fed. Pet. at 97. Petitioner contends that the inadequacies of Dr. Benson's evaluation were "patent" and either the result of (1) counsel's failure to provide adequate materials for Dr. Benson to consider during his evaluation, or (2) counsel's failure to guide Dr. Benson toward a legally cognizable defense. The Court already has determined that counsel did not fail to provide an adequate evidentiary basis for Dr. Benson's evaluation. *See ante*, at 45-48. Moreover, trial counsel's letters to Dr. Benson show that counsel repeatedly did seek to prepare Dr. Benson to testify to a legally cognizable defense prior to trial. Trial counsel also ultimately extracted information from Dr. Benson that could have supported a legally cognizable defense, albeit not voluntary manslaughter, when he had Dr. Benson testify that Petitioner's delusional thinking made Petitioner a "ticking time bomb" and that his subsequent state of rage rendered Petitioner "out of control" and that Petitioner entered an "automatic condition" which did not allow Petitioner to

59

fully comprehend his actions.  RT 3549-50, 3556-58, 3569, 3582-84, 3616, 3654 (Dr. Benson's trial testimony as to Petitioner's delusions and state of rage); RT 3693-94 (automatic condition did not allow Petitioner to fully comprehend his actions).

If accepted, Dr. Benson's testimony arguably could have allowed the jury to conclude that Petitioner did not actually deliberate killing Doreen and was therefore guilty of second degree murder.  *See People v. Carasi*, 44 Cal.4th 1263, 1306 (2008) (inquiry of whether a defendant actually deliberates is relevant in determining whether a murder falls under the first or second degree category); *see People v. Saille*, 54 Cal.3d 1103, 1107 (1992) (California no longer "permits a reduction of what would otherwise be murder to nonstatutory voluntary manslaughter due to voluntary intoxication and/or mental disorder").  Accordingly, there is ample evidence of counsel's effort to guide Dr. Benson's testimony at trial to a cognizable defense.  Moreover, given that Petitioner does not appear entitled to a voluntary manslaughter conviction based on the evidence adduced at trial or presented during his evidentiary hearing before this Court, the Court concludes that even if Petitioner's conduct did fall below "an objective standard of reasonableness," Petitioner has failed to show prejudice.  *Strickland*, 466 U.S. at 688.

Insofar as Petitioner faults trial counsel for failing to call Dr. Garton, Dr. French, or Dr. Stephenson to testify instead of Dr. Benson because their reports were more "helpful" to him (Fed. Pet. at 98), Petitioner minimizes or ignores the portions of those experts' reports that could have been used against him.  For example, Dr. Stephenson explicitly told trial counsel that he did not believe that Petitioner's grief was pathological in nature and that he therefore was not comfortable making any further contribution to Petitioner's case beyond his report.  Dkt. No. 300-30 at 9-10.  Dr. French's report similarly stated that Petitioner's psychiatric status was "essentially within normal limits," evidence that was used by the prosecutor to impeach Dr. Benson's testimony at trial.  Dkt. No. 300-29 at 479.  Dr. Garton's report also contained potentially

damaging assessments, including Dr. Garton's opinion that Petitioner's anger and resentments tended to lead to explosive outbursts in situations in which Petitioner was unlikely to be punished immediately.

Moreover, Petitioner fails to account for the fact that, while the other mental health experts did not testify, counsel used Dr. Benson, who had reviewed the other experts' reports, to introduce some of their more favorable impressions into evidence, including Dr. Stephenson's "masked rage" theory and Dr. Garton's general theory that Petitioner suffered from delusions related to Paul's death.  *See* RT 3686-3687 (Dr. Benson reading portions of Dr. Stephenson's report into the record).  Counsel could have reasonably concluded, and there is some evidence in the record to suggest, that having Dr. Benson testify as to the favorable conclusions of each expert, as opposed to calling each expert to the stand, would shield their opinions from any further cross-examination. *See United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) (noting that a difference in opinion as to trial tactics does not constitute denial of effective assistance); *see also Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984) (noting that tactical decisions do not constitute ineffective assistance simply because, in retrospect, better tactics would have been available); Dkt. No. 139, Exh. 5 (letter to Dr. Garton noting that counsel did not want to call him to testify at guilt phase to avoid further cross-examination).  Petitioner's argument that he was denied effective assistance of competent mental health experts in violation of the principle stated in *Ake v. Oklahoma*, 470 U.S. 68 (1985), *see* Fed. Pet. at 101, also fails, as the record contains no evidence suggesting that Petitioner did not have funding or access to competent mental health experts.

The Court concludes that Claim 11 also is unmeritorious and should be DENIED.

**f.  Penalty Phase:  Claim 17**

Claim 17 asserts that trial counsel rendered ineffective assistance in the penalty phase of Petitioner's trial by failing to present compelling evidence of mental disease in mitigation.  *See*

61

Fed. Pet. at 135. This claim was denied by the California Supreme Court as untimely, successive, and on the merits. *Dennis (William Michael) on H.C.* (S099587, November 27, 2002).

### 1. Penalty Phase Evidence

The California Supreme Court summarized the evidence presented during the penalty phase of Petitioner's trial as follows:

> By stipulation, the trial evidence was deemed included in the penalty phase. The prosecution introduced as additional evidence the materials found in [Petitioner]'s toolshed, which the prosecutor connected to [Petitioner]'s plan to drown the Erberts. [¶] [Petitioner] offered evidence from his friends and associates as to his childhood difficulties, his shyness and loneliness due to his hearing problem, his friendly and easygoing nature, his pride and love for his son and his devastation at Paul's death, his honesty, thoughtfulness, and sensitivity, his good record at Lockheed, and his compassion for others. [Petitioner]'s mother presented a pictorial biography of [Petitioner]'s life and their relationship and spoke of awards he won. The jury also heard a tape recording of [Petitioner] and his son.

*People v. Dennis*, 17 Cal. 4th at 499. This Court will summarize the evidence in somewhat greater detail.

In his opening statement, trial counsel told the jury that he believed that the jury had, during the guilt phase of trial, an opportunity to understand and examine why the crimes happened and that providing them with that opportunity had been his intention during the guilt phase. RT 4088. Counsel stated that he intended to present additional witnesses on Petitioner's behalf to give the jury a better understanding of the kind of life Petitioner led, the values in which he believed, and what had led him to the night of the crimes. Counsel also stated that he thought that showing the jury how much Petitioner's fatherhood meant to him and how Paul's death affected him was "really one of the critical issues in this case." RT 4090.

In aggravation, the prosecution called only Bert Caro, a homicide investigator who testified during the guilt phase of trial. RT 4092. Caro testified in more depth regarding items found on Petitioner's property, including two trapezoidal boxes, two anchors, two hand-sewn

bags, and a navigational chart of Northern California. RT 4095-96. According to Caro, the boxes, anchors, and bags were found in a tool shed on Petitioner's property. The navigational chart was pinned up like a poster over Petitioner's desk inside his home. Caro also noted that Petitioner owned a boat.

Trial counsel proceeded to call sixteen witnesses on Petitioner's behalf. One was Lila Vest, an insurance agent. RT 4098. Vest testified that she participated in an escrow closing for Petitioner's home and handled other insurance matters for Petitioner. She and Petitioner bonded over their children, and she stated that she admired Petitioner for being so diligent about seeing his child and paying child support. RT 4101. Vest liked Petitioner. During Petitioner's civil trial, Vest saw Petitioner in one of the courthouse corridors. Petitioner did not seem upset but seemed sad about his son's death and had tears in his eyes. She stated that Petitioner saw the lawsuit as a way to let Doreen know that what had happened to Paul was not okay. Vest saw Petitioner as an honest person, described Petitioner as mellow and quiet, and stated that it said a lot to her about Petitioner's character that he was there for his child financially and maintaining visitation with his child. Vest also stated that Petitioner was decent and fair. RT 4104.

Janet Withers, one of Petitioner's former supervisors during the month of October 1984, also testified on Petitioner's behalf. RT 4105. She testified that Petitioner was a good worker who listened a lot and tried hard. Petitioner had been "surplused" by Lockheed after his contract on a project ended. Withers testified about an incident in which Petitioner spoke to her and a coworker about Paul. Withers stated that she, a coworker, and Petitioner conversed about the coworker's photo of his son, which was displayed in his workstation. Petitioner began talking about Paul, mentioning his visitation schedule, and pulled out a photo of him. When asked Paul's age, Petitioner said that Paul "would have been" a certain age. RT 4106. When Withers asked Petitioner what he meant by "would have been" and Petitioner told her about Paul's death, it upset

her. According to Withers, the conversation struck her as "funny" because Petitioner spoke about Paul as if he was still alive.

Trial counsel also called Kenneth Marquardt, who participated in a bowling team with Petitioner for three years. RT 4107-08. Marquardt testified that Petitioner was a good bowler and that he did not get upset when he did not do too well. He and Petitioner got along pretty well, and Marquardt thought Petitioner was a "real good person." He and Petitioner worked on an addition to Petitioner's home together; Marquardt stated that Petitioner was a good worker who gave him full responsibility and authority to do his job and caused no problems. RT 4108-09. The addition they built was for Petitioner's mother; Petitioner and his mother got along very well. According to Marquardt, he was "in awe" and "totally shocked" when he heard about what happened. RT 4110. He believed for some time that Petitioner had not killed Doreen.

Eric Steinhauff, Petitioner's tenant, roommate, and coworker, also testified on Petitioner's behalf. RT 4110. Petitioner treated him "very well." RT 4112. Petitioner made him feel very welcome and made clear that anything in the house was there for his use as long as he took care of it. Steinhauff went out with Petitioner on several occasions; they went to bars, jogged together, and went skiing together. They established a friendship. Steinhauff described Petitioner as a very thoughtful, considerate person. Steinhauff thought that Petitioner was honest with him about records and expenses and thought that Petitioner and his mother had a very good relationship. Steinhauff and Petitioner discussed Paul once after Steinhauff asked Petitioner about a small picture Petitioner kept in the living room. Steinhauff stated that Petitioner was uncomfortable talking about the subject, but went into great detail about what happened. Steinhauff stated that the conversation was very painful for Petitioner and that Petitioner had a "great sorrow in his voice" when he spoke about Paul. RT 4114. Steinhauff testified that, during the course of the civil trial, Petitioner once "flipped out." RT 4115. Steinhauff stated that the period during the

64

civil trial was an uncomfortable time for him because Petitioner started to drink. Steinhauff said he believed the trial was not going well for Petitioner and, on several occasions, Steinhauff would come downstairs to find nearly-empty bottles of alcohol. RT 4116. Petitioner went through a lot of personality changes at that time. In one incident, Petitioner was working on a stained glass window in his living room. Petitioner was having trouble with the window and "just blew up, . . . screamed out some obscenities[,] and threw some of his tools around." *Id.* Steinhauff described Petitioner as unpredictable during that time.

Enoch Cole, Petitioner's former Lockheed coworker, also testified on Petitioner's behalf. RT 4117. Cole testified about the tile work he and Petitioner did for the space shuttle, which contained 35,000 of the types of tiles Petitioner worked on for Lockheed. RT 4119. He also told the jury about Petitioner's spraying duties for each unique tile. Sprayers were in charge of spraying each tile with a thin layer of coating, which required a "precise technique." RT 4120. Petitioner was good at spraying. While working together at Lockheed, Cole and Petitioner became good friends and looked out for each other. RT 4121. Cole knew Petitioner fairly well; Petitioner lent him lunch money. Cole described Petitioner as thrifty with his money and a source of investment or saving advice. He also stated that at some point, Petitioner wanted Cole to live with him, but Cole was living with a woman at the time, so he declined. RT 4123. When Cole met Petitioner, Petitioner was going through a divorce. Cole did not think that Petitioner wanted to get a divorce and thought it was unpleasant for him. RT 4124. When Cole met Paul, he thought that Petitioner's relationship with Paul "had a good aura." He stated that Petitioner never did anything or said anything bad about anyone on a personal level, although he had high expectations from people on his work team. RT 4125.

Ted Grish, one of Petitioner's friends from high school, testified that he and Petitioner were, and still were at the time of trial, good friends. RT 4131. Grish stated that he and Petitioner

bowled together and spent time together at Petitioner's house. Grish believed Petitioner's

relationship with his family was good and did not recall any fights between Petitioner and his

brother, John, or his mother. RT 4133. Grish knew that Petitioner suffered from a hearing

problem, but stated that he did not think it affected Petitioner much. Grish met Doreen at her and

Petitioner's wedding. Petitioner seemed happy. According to Grish, Petitioner was easy going,

easy to get along with, never seemed to get mad or have outbursts of anger, and was an all-around

good friend. RT 4135. Petitioner was loyal and reliable. Grish stated that Petitioner was a proud

father and that, when Paul died, Petitioner came by Grish's house, "devastated." *Id.* During the

time before the crimes took place, Grish stated that he could tell that Petitioner enjoyed being

around children. RT 4136. Grish could not believe that Petitioner could be the person who killed

Doreen when he first heard about the incident. Grish visited Petitioner in jail. Grish told the jury

that he still considered Petitioner a friend and that he would love to "go out there and shoot

another six [bowling] games with him." *Id.*

Trial counsel also called Harry Strum to testify on Petitioner's behalf. Strum was a friend

of Petitioner's and of Doreen's. RT 4137. Strum met Petitioner in the early 1970's, while

Petitioner was still married to Doreen, either in the park or through bowling. Strum and his wife

got together with Petitioner and Doreen often; they would visit each other's homes or go out

together. They were all friends. RT 4140. Petitioner and Strum celebrated their birthdays

together. RT 4141. Strum stated that he "felt really good" about Petitioner, enjoyed being with

him, and that Petitioner was funny and easy to talk to. He stated that both Petitioner and Doreen

were fun to be with and, at that time, they appeared to be a happy couple. Strum met Paul when

Petitioner and his family went to Vallejo to visit the Strums after Paul's birth. RT 4140. Doreen

was still breastfeeding Paul at the time. RT 4144. Petitioner was excited about Paul, treated him

well, played with him, and thought the world of him; Strum stated that he knew Petitioner loved

children. RT 4142. Strum stated that he thought Petitioner was a doting spouse to Doreen, noting

that Petitioner really went out of his way to please her. Strum testified that he visited Petitioner in

San Jose around 1982 or 1983. Strum joined Petitioner and his girlfriend on a day out. RT 4143.

Strum stated that they discussed Paul's death and that Petitioner was visibly agitated by it and

upset. Strum also testified that he thought Petitioner was an honest, truthful, fun-loving person.

Strum stated that Petitioner enriched his life.

Arlene Arken, Petitioner's stepmother, also testified on Petitioner's behalf. RT 4146.

Arken had known Petitioner since he was eleven years old. Arken testified that she saw Petitioner

and his brother regularly while they visited their father and that she was usually responsible for

taking the children to their medical appointments. RT 4147. She stated that she had a good

relationship with Petitioner and his mother and that Petitioner and his brother were very important

to their father. RT 4148. Arken stated that she always felt bad that Petitioner had a hearing

problem and that he did not get to go to school with the neighborhood children. She thought the

circumstances made Petitioner a lonely child. RT 4149. She also noted that Petitioner had a slight

speech impediment, which his father also had, and she believed that it bothered Petitioner. She

never got a chance to meet Paul.

Arken recalled teaching Petitioner and his brother how to bowl when they were younger,

and noted that Petitioner had become an excellent bowler. Petitioner was an average student, but

he did reasonably well. RT 4152. Arken helped Petitioner with his school work. She and

Petitioner's father were very proud of him. RT 4149. She also stated that she never had any

issues with Petitioner accepting her as a step-parent. She stated that they got along very well and

that Petitioner was always a good boy who did not cause them any problems. Not having any

children of her own, she cared about Petitioner a lot. RT 4150. Petitioner was a picky eater when

he was young, but would eat what Arken made for him. To Arken, Petitioner and his family were

close. They all made a point of spending the holidays together. RT 4153. Arken testified that she met Doreen while she and Petitioner were newlyweds; they seemed to be very much in love. RT 4153.

Arken's overall impression of Petitioner was that he was a bit of a loner and that his parents' divorce may have affected him because he was at an age when it was hard to lose a full-time father. RT 4151. Arken also stated that she always liked Petitioner and thought he was a very responsible young man; when Arken and Petitioner's father lent him some money to purchase a car, Petitioner was meticulous about paying them back with interest. She also noted that Petitioner was a good worker and would fix things around the home. She had not seen Petitioner since his wedding, as she and Petitioner's father got a divorce.

James Hall was another defense witness. RT 4155. Hall was one of Petitioner's good friends. Hall met Petitioner in the early 1970's through a mutual friend. He and Petitioner would stop by each other's homes to see each other, they talked and told each other stories, and they would see each other at parties and other similar functions. He considered Petitioner a "pretty good friend." RT 4158. Hall thought that he and Petitioner were very similar in that they were both divorced and had similar interests in improving their houses; Hall admired the work Petitioner did on his home. Hall met Doreen a few times and thought her relationship with Petitioner was fine. Hall saw Petitioner a few days before Doreen's murder. RT 4159. He and Petitioner watched a 49ers game on television and drank beers. He repeatedly described Petitioner as a "regular guy." RT 4159. Hall and Petitioner went on a ski trip together. RT 4161. Hall also testified that Petitioner was not too wild and did not drink too much. While Petitioner was not verbose, he did not mind talking. Hall also testified that Petitioner was quiet and somewhat of a loner. RT 4160-61.

Robert Webb, one of Petitioner's former tenants and roommates, also testified on

68

Petitioner's behalf. RT 4164. Webb met Petitioner in 1980 while Webb was going through a divorce. Webb described the period of time as a very difficult time in his life. He and Petitioner got along very well. Petitioner was very understanding of Webb's situation. There were times when Webb could not make the full rent payments on time and Petitioner was always flexible to fit Webb's needs as long as he followed through. RT 4166. Petitioner treated Webb very well. Webb also recalled that Petitioner never had a problem with Webb taking his daughters to the home and letting them stay there. His daughters got along with Petitioner as well and they would all tease each other. Webb testified that, at the time he lived with Petitioner, Petitioner would take care of his brother John, who was developmentally slow. RT 4171. Petitioner helped John with relationship problems and other normal issues.

Webb testified that Petitioner helped him by being there as a friend and listening to him. RT 4167. Webb could tell that Petitioner was hurting over the loss of his son, too. Webb stated that he was not able to reach out to Petitioner to help him through Paul's death due to his own emotional problems at the time, and he wished he had. RT 4168. Webb wanted to take Petitioner to church with him to talk about forgiveness, but was never able to because he was too preoccupied by his situation when he was living with Petitioner. RT 4172. Webb told the jury that Petitioner treated people with kindness and was very tolerant. Webb described how Petitioner used to be kind to strangers who stopped by his home to talk about religion by talking to them for fifteen or twenty minutes rather than just telling them that he did not want to talk to them. Webb also described Petitioner as very considerate toward others. RT 4168. Petitioner occasionally got upset when his tenants did not clean the kitchen after using it, but Webb thought that Petitioner's upset was nothing out of the ordinary even though each of his tenants was an adult who should have known better. Petitioner was not, in Webb's opinion, happy-go-lucky. Petitioner tended to be a bit lonely and was hurting inside over the loss of his son. RT 4169-70. Petitioner

69

occasionally spoke about his son and indicated that he blamed Doreen for Paul's death. He also

mentioned that Paul was in the pool for too long. Webb and Petitioner had different schedules but

would see each other during week mornings and on the weekends. RT 4175. When Webb moved

out of the home to have more space for his daughters, he and Petitioner spoke a few times about

bills and mail.

Another defense witness, Faye Del Pino ("Faye"), had known Petitioner since he was

infant. RT 4180. She and her husband, Mario Del Pino ("Mario"), took care of Petitioner when

his mother was in the hospital giving birth to Petitioner's brother John. They continued to see

each other frequently over the years until he reached adulthood, when their visits dwindled to once

or twice a year. She testified that Petitioner was a cute likable boy when he was young and that he

was somewhat shy; Petitioner related a lot to her husband and they would fish together. RT 4181.

Faye was aware of Petitioner's hearing problem and thought that it made him a bit shyer than he

would have been otherwise. She thought Petitioner would sometimes miss part of the

conversation. Faye met Doreen a few times while she and Petitioner were still married and

thought they got along well. RT 4182. Doreen was a good hostess and appeared to be a good

mom. Petitioner appeared to care for her and for his son very much. She recalled that Petitioner

once took Paul over to her home and they arrived dressed in matching suede jackets. She thought

Paul was the most well-behaved child she ever saw. She did not see Petitioner around too often.

Mario testified that he was close friends with Petitioner's father. Mario agreed with his

wife's description of Petitioner, but added that he thought Petitioner had a hard time hearing

sometimes, which Mario believed frustrated Petitioner. RT 4187. Mario stated that they saw

Petitioner at different stages of his life and he could see that it was still a problem for him.

According to Mario, Petitioner was a well-behaved child, but had somewhat of a temper when he

was frustrated, although he thought all children, including Mario's own children, had a similar

70

temper. RT 4188. Mario stated that Petitioner's brother John also had a hearing problem, but appeared to cope with it better than Petitioner. RT 4188. Mario thought Petitioner might be "a little slow," but he could not be sure. He also thought that Petitioner had a hard time expressing himself. When Mario met Doreen, things between Doreen and Petitioner appeared to be well. He recalled meeting Doreen when she and Petitioner announced their engagement and compared them as a world-wise woman and an innocent lamb, respectively. RT 4190. He thought he had good reason to believe that they were "two different kinds of fishes." *Id.*

Barbara Thorn ("Barbara") knew Petitioner during high school, but they met again after she began dating her ex-husband, David Thorn. RT 4192. When Barbara and Petitioner were in high school, Barbara was fairly popular, but Petitioner was not very popular, had a small group of friends, no girlfriend, and was on the outward fringe of things, including the main factions at their high school, the "Ra-ra crowd" and the hippie crowd. RT 4194. She had previously described Petitioner as a non-person. RT 4195. Petitioner wore grease in his hair and went bowling, both of which were not common among their classmates at the time. RT 4193. Barbara described her perception of Petitioner as socially inept; she thought that Petitioner's speech impediment and hearing problems made him seem like a jerk to people who did not know him during high school and described him as treading water with his medical issues. RT 4194. Petitioner seemed lonely. RT 4196. After actually meeting Petitioner, Barbara thought that Petitioner was a nice and intelligent person. RT 4195. She believed that Petitioner was very sensitive because of the way he had been treated as a result of his "handicaps." According to Barbara, Petitioner blossomed a bit after high school and began dressing a bit better, meeting women, and adjusting his life. Petitioner was also able to be more open about his hearing problem. RT 4197.

Like the other lay witnesses, Barbara described Petitioner as very considerate and a nice person. When Paul was born, it was the greatest thing that ever happened to Petitioner; Barbara

stated that she believed Petitioner really loved Doreen. Petitioner would constantly talk about

Paul and tell Barbara and her husband about new things happening with Paul. They fell out of

touch for some time until Petitioner called her, distraught, after Paul died. RT 4198. Petitioner

was very upset with Doreen. Petitioner told Barbara that the only thing he had asked Doreen to do

after giving her his apartment was that she put up a fence for Paul in order to keep him safe.

Barbara stated that Petitioner was also upset that Doreen had been on the phone while Paul

drowned. Barbara tried to console Petitioner, but he seemed inconsolable. Petitioner was grief-

stricken over his son. Petitioner had a very close bond with Paul and, according to Barbara, when

Paul died, it was the worst thing that ever happened to Petitioner. RT 4199. Barbara still

considered Petitioner a friend although she had read reports of what happened to Doreen's fetus in

the newspaper.

Lee ("Smethurst") and Pearl Smethurst, Petitioner's neighbors at the time of the crimes,

also testified on Petitioner's behalf. RT 4200 & 4203. Smethurst testified that Petitioner was an

ordinary and caring person, and recalled that Petitioner once saw Smethurst throwing out some

mattresses and asked to keep one for a lodger who did not have a bed. Smethurst thought

Petitioner was a good neighbor. Pearl Smethurst stated that she and Petitioner bonded over the

fact that she was English, and Petitioner's mother was from Great Britain as well. RT 4104.

Petitioner was very friendly and a very nice, respectful neighbor and seemed to love his son.

Petitioner's final witness was his mother, Elizabeth Ross. She worked at Lockheed with

Petitioner and, at some point, moved into the addition Petitioner constructed for her in his home.

Ross was asked by counsel to create a pictorial biography of Petitioner and she did so using thirty-

nine photographs of Petitioner. The photo album contained photographs of Paul at varying ages,

as well as photographs of Petitioner and Paul together, Paul and Petitioner's father together,

Petitioner and his brother together, Petitioner and his mother together, Petitioner by himself,

72

Petitioner and his grandmother, Petitioner and his cousin, a family photo including Doreen, and Petitioner's home. Ross also included photographs of Petitioner throughout his life, including some of him as a little boy and others from his high school days. As she went through the photos, Ross testified that Petitioner looked sweet and happy.

Ross additionally testified about some of Petitioner's achievements. She introduced a letter written by Lockheed's president commending Petitioner for giving two gallons of blood to the blood bank at Lockheed, an achievement award Petitioner received for working with the space shuttle program, a photo of Petitioner's bowling trophies, and Petitioner's associate degree certificate. Ross also took in a letter from Petitioner, written while he was in high school, thanking her for a radio she gifted him. Ross testified that Petitioner was very close with his father and his grandmother. RT 4217. She also testified that Petitioner recorded a tape for Paul on February 13, 1979—one year before Paul died. The tape was played and admitted into evidence.

### 2. Analysis

Petitioner first argues that the evidence presented by counsel at the penalty phase was not meaningful mitigation evidence. Fed. Pet. at 135. The record belies Petitioner's contention. As is apparent from the summary above, many of Petitioner's witnesses testified about Petitioner's good character, good deeds, love for his son and good parenting skills, Petitioner's pain at losing Paul, and his marked deterioration following the loss of his civil case against the Erberts. Under California Penal Code section 190.3, all of these sympathetic circumstances could be considered by the jury in mitigation. *See* Cal. Pen. Code §190; *see also People v. Dennis*, 17 Cal. 4th at 547-48. Accordingly, the California Supreme Court reasonably could have rejected this argument. *Richter*, 562 U.S. at 101.

Petitioner also argues that trial counsel was ineffective in failing to present evidence at the

73

penalty phase regarding Petitioner's mental disease. Fed. Pet. 137. While it is true that counsel did not recall Dr. Benson or any other mental health professionals to testify during the penalty phase, the parties stipulated that all guilt phase evidence would be admitted at the penalty phase, including Dr. Benson's testimony regarding Petitioner's background and mental health. Indeed, during the penalty phase closing argument, the prosecution referred to Dr. Benson's testimony as an attempt by the defense to persuade the jury that Petitioner committed the crimes under the influence of extreme emotional or mental disturbance, a mitigating factor under California Penal Code § 190(d). *People v. Dennis*, 17 Cal. 4th at 499; RT 4249.

Given that trial counsel repeatedly referred to Dr. Benson's testimony throughout his guilt phase closing argument mere days before the penalty phase began, the fact that Dr. Benson's testimony was admitted as evidence during the penalty phase, and the fact that the trial court instructed the jury that it "shall consider all of the evidence which has been received during any part of the trial of [Petitioner's] case," including "whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," (RT 4289-90) the California Supreme Court reasonably could have rejected Petitioner's argument that counsel was ineffective because he failed to present *any* mental health evidence at the penalty phase. *Richter*, 562 U.S. at 101.

To the extent that Petitioner argues, without accounting for Dr. Benson's testimony, that trial counsel's failure to present mental health testimony was not a strategy choice because counsel failed to adequately investigate Petitioner's mental health issues (Fed. Pet. at 142), this Court again finds and concludes that the record shows otherwise. Petitioner's trial counsel had prepared a detailed social history report about Petitioner, had engaged several experts to examine Petitioner, and had received a multitude of reports from various mental health professionals who had evaluated Petitioner. This is therefore "not a case in which trial counsel failed to conduct any

mental health investigation." *See Carter v. Chappell*, 2013 WL 1120657 (S.D. Cal. Mar. 18, 2013). Nevertheless, Petitioner appears to argue that counsel was ineffective for simply failing to continue consulting experts until one of them made the diagnosis that ultimately was made by Dr. Woods years later. As previously noted, this is not what the Sixth Amendment requires. *See Hendricks v. Calderon*, 70 F.3d at 1039 (counsel entitled to rely on experts' conclusions in order to make strategic choices).

Petitioner also faults counsel for failing to call Dr. Garton to testify during the penalty phase. Fed. Pet. at 138 & 140. Petitioner analogizes this case to *Deutscher v. Whitley*, 884 F.2d 1152, 1159-60 (9th Cir. 1989), vacated on other grounds, 500 U.S. 901 (1991). In *Deutscher*, the defendant was convicted of first degree murder and robbery. During the penalty phase of trial, Deutscher's attorney put on a mitigation case that consisted of a theory that the defendant must have had mental health issues, but the attorney did not investigate or introduce any mental health evidence on the defendant's behalf. *Id*. at 1159. The Ninth Circuit held that the attorney was ineffective, noting that in choosing to present a mental health defense, the attorney had a duty to make a reasonable investigation of Deutscher's mental health history.

Again, the authority cited by Petitioner is distinguishable. Here, as discussed previously, trial counsel not only investigated Petitioner's mental health issues but also presented substantial mental health evidence during the guilt phase that was admitted into evidence at the penalty phase. After the jury apparently rejected his mental health evidence in the guilt phase, Petitioner's trial counsel told the jury that he intended to give the jury a better understanding of the kind of life Petitioner led, what values he believed in, and what led him to the night of the crimes (RT 4090). As summarized above, counsel then presented a series of lay witnesses who testified about Petitioner's good character, his childhood, his devastation after Paul's death, and his transformation following the loss at his civil trial, arguing during closing that the circumstances of

75

the case were a tragedy.  RT 4269, 4273, 4281-82.  For matters of trial strategy, the Court must

"indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable

professional assistance."  *Strickland*, 466 U.S. at 689.

Here, Petitioner already had presented mental health evidence during the guilt phase and,

even if the jury ultimately not persuaded by that evidence as to guilt, the evidence should have still

been relatively fresh in their minds.  Under these circumstances, trial counsel reasonably could

have concluded that Dr. Garton's testimony, which counsel apparently believed would have been

largely cumulative to Dr. Benson's testimony, would not have been helpful to Petitioner at the

penalty phase.  *See Bell v. Cone*, 535 U.S. 685, 699-700 (trial counsel not ineffective by failing to

recall expert during penalty phase given mental health defense at guilt phase); *see also Pinholster*,

563 U.S. at 196 (court must affirmatively entertain the range of possible reasons trial counsel may

have had for proceeding as they did as long as they are reasonable).  The California Supreme

Court reasonably could have rejected Petitioner's argument that counsel was ineffective in calling

Dr. Garton to testify at the penalty phase of his trial.  *Richter*, 562 U.S. at 101.

Petitioner also contends that counsel failed to present evidence that would tend to reduce

Petitioner moral culpability, such as evidence regarding Petitioner's delusions and the aspects of

Petitioner's life that resulted in the formulation of those delusions.  Fed. Pet. at 143.  Petitioner

cites no Supreme Court precedent requiring counsel to present such evidence in mitigation and,

indeed, there is Supreme Court precedent stating that counsel need not always present mitigating

evidence.  *See Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (counsel not ineffective in failing

to present mitigation evidence in lieu of plea for mercy).  In any event, the trial record shows that

counsel did present evidence on this point—Dr. Benson's testimony was admitted at the penalty

phase, and the jury was entitled to consider it for purposes of mitigation.

To the extent that Petitioner argues that the jury was unable to consider the background

76

evidence relied upon by Dr. Benson for the truth of the matter, Petitioner does not account for the testimony from a number of Petitioner's penalty phase witnesses, which reinforced large portions of the information at issue, including Petitioner's hearing issues, his use of a hearing aid, his parents' divorce, his life at the fringes of groups at his high school, his difficulty with women and relationships, his deterioration after Paul's death, his further deterioration after the loss at the civil trial, his continuous blaming of Doreen for Paul's death, his loneliness as a child, his social awkwardness, and his perceived social ineptitude during his younger years. RT 4112-16, 4135-36, & 4167-72 & 4148-51 & 4181-99. As this Court already has noted, many of Petitioner's penalty phase witnesses also testified about Petitioner's good character, his "mellow and calm" nature, his good deeds, his love for his son and good parenting skills, and his pain at losing Paul. Finally, at least one penalty phase witness, Withers, testified about an instance showing that Petitioner, as Dr. Benson noted in his guilt phase testimony, held up Paul to an extreme degree even after his death. RT 4105-06. All of the preceding evidence could be considered in reducing Petitioner's moral culpability under California Penal Code section 190.3. *See* Cal. Pen. Code §190; *see also People v. Dennis*, 17 Cal. 4th at 547-48. The California Supreme Court reasonably could have concluded that Petitioner failed to show that counsel was ineffective in these circumstances. *Richter*, 562 U.S. at 101

Petitioner also claims that trial counsel unreasonably failed to present expert or lay evidence that Petitioner had displayed good behavior and the ability to adjust to prison life if sentenced to life without the possibility of parole. Fed. Pet. at 143. Petitioner cites no Supreme Court authority holding that counsel had a duty to introduce such evidence to be considered effective and cites no evidence to support his contention. Moreover, while such experts are fairly common in death penalty cases (s*ee Skipper v. South Carolina*, 476 U.S. 1 (1986) (capital defendants are entitled to present evidence of good behavior and lack of future dangerousness)),

77

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10

here, the prosecution did not present any evidence at the penalty phase of future dangerousness and instead based its argument for a death sentence solely on the facts of the crime and Petitioner's meticulous planning of Doreen and Charles' deaths. RT 4092. Counsel reasonably could have made a strategic decision not to open the door for the prosecution to introduce evidence to rebut any "future dangerousness" evidence presented by the defense. *See Pinholster*, 563 U.S. at 195 (beyond the requirement of reasonableness, " 'specific guidelines [as to counsel's actions] are not appropriate' ") (citing *Strickland*, 466 U.S. at 688), and the California Supreme Court reasonably could have rejected Petitioner's argument that counsel was ineffective in failing to present evidence of no future dangerousness. *Richter,* 562 U.S. at 101.

11
12
13
14
15
16
17
18

Finally, Petitioner states that his death sentence violates the constitution because the jury was not able to consider his mental health evidence as mitigation. Fed. Pet. at 144. In support, he cites *California v. Brown*, 479 U.S. 538, 554 (1987) and *Skipper v. South Carolina*, 476 U.S. 1. As Petitioner does not argue that California's statutory scheme or a jury instruction prevented him from presenting mitigating evidence, neither case is on point. Moreover, for the reasons already discussed above, Petitioner's contention that the jury was unable to consider mitigating evidence, including mental health evidence, is meritless.

19

The Court concludes that Claim 17 is unmeritorious and should be DENIED.

20

### III. DISPOSITION

21
22
23
24
25
26
27

Good cause therefor appearing, Claims 3, 11, and 17 will be DENIED on the merits. Claims 18.B.7, 23, and 25 remain undecided, and Petitioner has filed a renewed request for an evidentiary hearing on the remaining claims. Before ruling on that request, the Court requests the views of the parties as to whether in light of this Order the remaining claims are appropriate for summary disposition and the Court should reconsider its previous decision to hold an evidentiary hearing as to those claims. Accordingly,

28

1. On or before January 30, 2018, Petitioner shall file a brief explaining why one or more of the remaining claims should not be disposed of summarily and, if not, whether any of the claims requires an evidentiary hearing.

2. On or before February 16, 2018, Respondent shall file an opposition brief.

3. On or before March 16, 2018, Petitioner may file a reply brief. The matter thereafter shall be submitted pending further direction from the Court.

**IT IS SO ORDERED.**

DATED: December 19, 2017



JEREMY FOGEL
UNITED STATES DISTRICT JUDGE

79