UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MICHAEL DENNIS,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>RON DAVIS, Warden of California State Prison at San Quentin,<br><br>　　　　Respondent. | Case No. 98-cv-21027-JF<br><br>**ORDER RESOLVING REMAINING CLAIMS, DENYING PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING, AND PARTIALLY GRANTING CERTIFICATE OF APPEALABILITY**<br><br>**DEATH PENALTY CASE** |

On December 19, 2017, following resolution of all other claims in the above-entitled action, the Court ordered the parties to brief the merits of Claims 18.B.7, 23, and 25. *See* Dkt. No. 423. Based upon the briefing, the underlying record, the evidence and exhibits adduced during the pendency of the action, and all other papers filed to date, the Court finds and orders as follows.

## I. BACKGROUND

**A. Facts**

The facts of this case have been described at length in previous orders (*see, e.g.* Dkt. Nos. 117 & 423). As relevant here, Petitioner was found guilty by a Santa Clara Superior Court jury of the first-degree murder of his former wife, Doreen Erbert, and the second-degree murder of Ms. Erbert's unborn child. At the time of her death, Ms. Erbert was eight months pregnant.

Ms. Erbert and Petitioner previously had been married and had a son, Paul, together. The

1

marriage ended in divorce, and Ms. Erbert married Charles Erbert in 1979. That same year, the Erberts had a daughter, Deanna Erbert. In 1980, after Petitioner had returned Paul to the Erberts' home following a custodial visit, Paul drowned in the family's swimming pool. Ms. Erbert was home with Paul at the time, and Petitioner blamed Ms. Erbert for Paul's death.

On Halloween night in 1984, Ms. Erbert was stabbed and killed in her home. Ms. Erbert was visibly pregnant at the time; she was stabbed in the arm, neck, and stomach, and her unborn child was found lying, in parts, on the living room floor. When paramedics arrived, the fetus already was dead. Ms. Erbert died en route to the hospital. Petitioner eventually was arrested and tried for the murder of Ms. Erbert and the fetus. Although he initially denied that he had committed the crimes, Petitioner did not contest his identity as the killer at trial. Petitioner's trial counsel argued that Petitioner's actions resulted from mental illness and were not premeditated or deliberate. The jury found as a special circumstance that Petitioner had committed multiple murders. Following a separate penalty trial, the jury returned a verdict of death for the killing of Ms. Erbert.

**B. Procedural Posture**

In June 1995, following his conviction in the trial court, Petitioner filed an automatic appeal in the California Supreme Court. On February 19, 1998, the judgment of the trial court was affirmed. A petition for writ of certiorari to the United States Supreme Court was filed on April 15, 1998, and denied on October 5, 1998. On August 8, 1996, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. That petition was denied on November 4, 1998.

Petitioner's initial petition for writ of habeas corpus in this Court was filed on May 2, 2001. The Court found that the petition contained unexhausted claims and ordered Petitioner to file an amended petition alleging only exhausted claims or to dismiss this action. Petitioner filed

2

an amended petition on August 3, 2001. He also filed an exhaustion petition in state court the same day; that petition was denied on November 27, 2002. A second amended petition was filed in this Court on February 11, 2003. *See* Dkt. No. 80 ("Fed. Pet."). Respondent filed an answer on June 18, 2003, and Petitioner filed his traverse on July 14, 2003. *See* Dkt. Nos. 162 & 165.

On July 27, 2009, following substantial motion practice that resulted in the determination of most of Petitioner's claims, this Court granted Petitioner's motion for an evidentiary hearing as to Claims 3, 11, 17, 18.B.7, and 25 (including the component of claim 25 described in subclaim 18.B.1), all of which assert ineffective assistance of counsel. *See* Dkt. No. 250 at 2. The Court later bifurcated the evidentiary hearing, ordering that the first phase of the hearing would address only Petitioner's mental-health claims, i.e., claims 3, 11, and 17. *See* Dkt. No. 254. A three-day hearing took place from April 21-23, 2014. *See* Dkt. Nos. 379-381. On May 15, 2017, the Court denied without prejudice Petitioner's request to set the second portion of the evidentiary hearing. *See* Dkt. Nos. 415 & 417. The Court subsequently denied Claims 3, 11, and 17 on the merits. Based on the evidence presented at the hearing and its assessment of that evidence, the Court directed the parties to brief the remaining claims on the basis of the existing record. *See* Dkt. No. 423.

### C. Penalty Phase Trial

The Court's order with respect to Claims 3, 11 and 17 contains a detailed discussion of Petitioner's penalty phase proceedings. *See* Dkt. No. 423. The prosecution called one witness, Detective Caro, in aggravation. Detective Caro testified that in the course of his investigation he found two trapezoidal boxes, two anchors, two hand-sewn bags, a boat, and a navigational chart of Northern California at Petitioner's residence. The prosecutor connected the items to an alleged plan on Petitioner's part to drown the Erberts. The defense called sixteen witnesses in mitigation. *See id.* at 62-73. As the Court noted, the defense witnesses testified about various aspects of

3

Petitioner's life, including his troubled childhood, his good character and good deeds, and his pain and anguish at losing his son.

During her closing argument, the prosecutor pointed out that Petitioner had not called several additional witnesses who might have offered evidence in mitigation and asserted that of the witnesses Petitioner did call, "not one, not one asked that [Petitioner's] life be spared. Not one had the nerve." *See* RT 4266.

**D. Expert Testimony Proffered at the Evidentiary Hearing**

On October 18, 2013, in preparation for the evidentiary hearing, Petitioner filed declarations from several medical and legal professionals in support of Claims 3, 11, 17, 18.B.7, and 25. *See* Dkt. No. 299. The testimony of these witnesses is summarized in the order denying Petitioner's mental-health claims and for the most part is not relevant to the remaining claims considered here. *See* Dkt. No. 423. However, Petitioner's *Strickland*[1] expert, Thomas Nolan, did testify that reasonably effective counsel would have asked mitigation witnesses to testify as to whether Petitioner's life should be spared. *See* Dkt. No. 375-3 at 26. Mr. Nolan also testified that Petitioner's trial counsel had no reasonable strategic basis for failing to do so.

Petitioner also submitted the declarations of five lay witnesses who stated that they would have asked the jury to spare Petitioner's life during the penalty phase had that question been put to them. *See* Dkt. Nos. 299-16 (Petitioner's brother, John Dennis); 299-48 (Petitioner's mother, Elizabeth Ross); 299-59 (Petitioner's friend, Eric Steinhauff); 299-60 (Petitioner's friend, Barbara Thorn); and 299-61 (Petitioner's friend, Robert Webb). Ms. Ross, Mr. Steinhauff, Ms. Thorn, and Mr. Webb, all of whom testified during the penalty phase, noted specifically in their declarations that trial counsel never asked them whether they believed Petitioner's life should be spared.

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

4

## II. DISCUSSION

### A. Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Review under § 2254 is limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011); *see also* 28 U.S.C. § 2254(d)(2).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and distinct meanings. *See Williams*, 529 U.S. at 404. A state court decision is "contrary to" Supreme Court authority, and thus falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *See id.* at 412-13. A state-court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *See id.* at 413. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an

unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

On habeas review, the court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *See Williams*, 529 U.S. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409; *see also Harrington v. Richter*, 562 U.S. 86, 101 (2001) ("'[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law'") (emphasis in original) (internal quotation and citation omitted). Accordingly, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 88 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts." *Clark*, 331 F.3d at 1068.

A state court's factual determinations are accorded similar deference. *See Pinholster*, 563 U.S. at 180-81. A state-court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340 (citing § 2254(d)(2)); *see also id.* (holding state court's factual determinations "are presumed correct absent clear and convincing evidence to the contrary") (citing § 2254(e)(1)).

When a federal court is presented with a state-court decision that is unaccompanied by a rationale for its conclusions, and there is no reasoned decision by a lower court, the court has no basis other than the record "for knowing whether the state court correctly identified the governing

6

legal principle or was extending the principle into a new context." *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000), *overruled on other grounds by Lockyer*, 538 U.S. 63; *cf. Wilson v. Sellers*, ___ S.Ct. ___, 2018 WL 1800370, at *3 (Apr. 17, 2018) (holding federal habeas court should "look through" the unexplained state-court decision to the last state-court decision "that does provide a relevant rationale"). In such situations, federal courts must conduct an independent review of the record to determine whether the state court decision is objectively unreasonable, and "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

Even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (internal quotation and citation omitted). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

### B. Ineffective Assistance of Counsel

Petitioner asserts in Claim 18.B.7 that trial counsel was ineffective at the penalty phase of his trial. Specifically, Petitioner argues that trial counsel was ineffective in failing to present available witnesses who would have asked the jury to spare Petitioner's life. *See* Fed. Pet. at 152. This claim was summarily denied by the California Supreme Court.

#### 1. Standard of Review

The clearly established federal law applicable to this claim is set out in *Strickland*, 466 U.S. 668. In *Strickland,* the U.S. Supreme Court held that ineffective assistance of counsel is cognizable as a denial of the Sixth Amendment right to counsel, which guarantees not only

7

assistance, but effective assistance, of counsel. *Id.*, 466 U.S. at 686. To prevail on an ineffective assistance of counsel claim, a petitioner must establish that: (1) his counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688-94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Ultimately, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances. *Id.* at 689 (internal quotation marks omitted). "In assessing adequacy of representation, '[the Court] is required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as he did.'" *Gallegos v. Ryan*, 820 F.3d 1013, 1030 (9th Cir. 2016) (citing *Pinholster*, 563 U.S. 170). A "doubly" deferential standard of review is appropriate in analyzing ineffective assistance of counsel claims under AEDPA because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential." *Richter,* 562 U.S. at 105 (internal quotation marks omitted). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

At the outset, Petitioner argues the Court should consider his claims *de novo* because the California Supreme Court's denial of Claim 18.B.7 in a summary opinion was a finding that Petitioner did not make a prima facie case for relief and therefore was "objectively unreasonable" for purposes of § 2254(d). *See* Pet. Br. at 10-11. Respondent concedes that the California Supreme Court's summary denial of Petitioner's claim reflected a determination that Petitioner did

8

not state a prima facie case entitling him to relief, but he argues the pivotal question nonetheless is " 'whether the state court's application of the *Strickland* standard was unreasonable,' " not whether Petitioner made a prima facie showing. *See* Dkt. No. 429 ("Resp. Br.") at 7 (quoting *Richter*, 562 U.S. at 98-99). For the reasons discussed below, the Court concludes that the California Supreme Court's summary denial of this claim was not objectively unreasonable. The Court would reach the same result on *de novo* review.

### 2. Reasonableness of Trial Counsel's Conduct

Petitioner claims that trial counsel's failure to present witnesses asking the jury to spare Petitioner's life was unreasonable, fell below the prevailing professional standard of competence, and cannot be justified by any tactical objective. *See* Fed. Pet. at 153. Respondent denies that trial counsel was ineffective and contends that even if he was, Petitioner has failed to show prejudice. *See* Resp. Br. at 9-13. Respondent does not dispute that the five witnesses who have submitted declarations relevant to Claim 18.B.7 would have asked the jury to spare Petitioner's life had trial counsel made an inquiry. *See* Resp. Br. at 13.[2]

Respondent first argues that the witnesses' proffered testimony is "execution impact" evidence and would not necessarily have been admissible at trial. According to Respondent, "execution impact" evidence is irrelevant except to the extent that it relates to a defendant's character. *See* Resp. Br. at 11. While Respondent is correct as to the general rule, the testimony at issue here was relevant and likely admissible because testimony from a close friend or loved one that a capital defendant deserves to live is admissible as "indirect evidence of the defendant's character." *People v. Ochoa*, 19 Cal. 4th 353, 456 (1998), as modified (Jan. 27, 1999). As

---

[2] Based on this concession, as well as the California Supreme Court's practice of assuming the veracity of supported factual allegations when issuing a summary denial, the Court may rule on Claims 18.B.7 and 25 under the assumption that Petitioner's proffered witnesses would have testified consistently with the declarations they have submitted to the Court.

9

Petitioner points out, similar testimony routinely has been admitted during California capital trials. *See People v. Sanders*, 11 Cal. 4th 475, 545 (1995) (noting that defendant's siblings were allowed to plead for defendant's life); *People v. Freeman*, 8 Cal. 4th 450, 522 (1994) (holding that "it is permissible for defense counsel to ask family members and friends about the appropriateness of a death sentence"); *People v. Bennett*, 45 Cal. 4th 577, 601 (2009) (noting that pleas for defendant's life were admitted to " 'illuminat[e] some positive quality of the defendant's background or character' "); *People v. Heishman*, 45 Cal.3d 147, 194 (1988), *abrogated on other grounds by People v. Diaz*, 60 Cal.4th 1176 (2015) (holding that trial counsel should have been allowed to ask defendant's wife whether she thought defendant should receive the death penalty). The Court concludes that Petitioner has made a sufficient showing that the proffered testimony would have been admissible.

Respondent next argues that the testimony was unnecessary and cumulative to the testimony given by Petitioner's other penalty phase witnesses. *See* Resp. Br. at 9-13. Specifically, Respondent contends that because penalty phase jurors must make a binary choice between life imprisonment and death, the jurors in this case would have understood that the sixteen penalty phase witnesses called to testify on Petitioner's behalf each were testifying "in service of persuading the jury to exercise the more merciful option [of the possible sentences]." *See* Resp. Br. at 10.

The Court agrees that the penalty phase jurors reasonably could have inferred that at least some of Petitioner's witnesses wanted Petitioner to live. Many of Petitioner's witnesses expressed love and affection toward Petitioner, permitting a reasonable inference that they wanted the jury to spare Petitioner's life. However, without the witnesses' clear testimony on the matter, the jurors were free to draw their own conclusions as to the purpose of each witness's testimony, especially with respect to those witnesses who, in addition to testifying about Petitioner's character, provided

10

background information or observations about Petitioner's behavior after Paul's death. Accordingly, Respondent's point is more salient with respect to the prejudice prong of *Strickland*, which is addressed below.

To perform effectively at the penalty phase, trial counsel should " 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' " *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001). Here, trial counsel failed to " 'present[ ]' " the testimony of several penalty phase witnesses who were willing to ask the jury explicitly to spare Petitioner's life; with the exception of the testimony of Ted Grish, counsel also failed to " 'explain[ ] the significance' " of the testimony that the witnesses did provide. *Id.*; *see* RT 4279 (trial counsel noting, during closing argument, that "[f]or someone like Ted Grish, who would come in and say, yeah, I visited him in jail, and I'd love to go bowling with him, that's important, too"). Because the proffered testimony had at least some mitigating value, was available at the time of trial, and was not the type of evidence that would have opened the door to damaging evidence in rebuttal, the record reveals no apparent strategic basis for trial counsel's failure to introduce it. *Cf. Mickey v. Ayers*, 606 F.3d 1223, 1243-44 (9th Cir. 2010) (holding counsel was not ineffective in failing to introduce evidence of defendant's childhood abuse because it would have invited the prosecution to present rebuttal evidence of defendant's own sexual abuse of his step-daughter).

Respondent also argues that trial counsel could not have anticipated the prosecutor's comment that none of Petitioner's penalty phase witnesses had the "nerve" to ask the jury to spare Petitioner's life. *See* Resp. Br. at 11. This argument is misplaced; the reasonableness of trial counsel's conduct does not turn on anything the prosecutor said but rather counsel's failure to present clear testimony seeking mercy for Petitioner despite the availability of several witnesses being willing to testify toward that end. The prosecutor's closing argument simply called attention to trial counsel's failure to present the testimony.

11

Because the record as a whole supports a conclusion that trial counsel's conduct was not justified by strategic considerations, the Court concludes for present purposes that the first prong of *Strickland* has been satisfied.

### 3. Prejudice

However, to obtain habeas relief, Petitioner also must show prejudice. As noted, a petitioner must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Petitioner directs the Court's attention to *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997) and *Hall v. Washington*, 106 F.3d 742 (7th Cir. 1997). In *Austin*, the Sixth Circuit held defense counsel was ineffective when he failed to investigate and present mitigating evidence during the penalty phase of defendant Austin's trial. *See Austin*, 126 F.3d 848-49. Austin's friends, family, and several death penalty experts were ready and willing to testify on his behalf. *Id.* at 849. However, defense counsel did not think presenting mitigating evidence would "do any good" and opted not to present any witnesses or other evidence. *Id.* at 849. The panel held that the Sixth Amendment requires that a capital jury consider the circumstances of the crime and the defendant's background during the penalty phase, and defense counsel's reasoning did not "reflect a strategic decision, but rather an abdication of advocacy." *Id.* Accordingly, the Sixth Circuit remanded the case for retrial of the penalty phase.

In *Hall*, the Seventh Circuit concluded that defense counsel was ineffective during the penalty phase because counsel failed properly to advise Hall about the consequences of waiving a jury for the penalty phase, failed to explain the purpose of Hall's speaking to the probation officer compiling the sentencing report, and failed to contact Hall to discuss penalty phase strategy

12

throughout the six weeks between the guilt and penalty phases. *Hall*, 106 F.3d at 747. The panel also observed that defense counsel failed to call several witnesses who wanted to testify about instances in which Hall had saved people's lives or had put himself in danger to help others. *Id.* Instead, defense counsel presented only the testimony of a minister who testified that Hall had attended church services for a year prior to the crimes. The Seventh Circuit held that Hall had made a sufficient showing of both ineffectiveness and prejudice, noting that "[w]ithout a reasonable showing of mitigation by the defense," the factfinder had "no choice" but to find "a 'complete absence of mitigating factors.' " *Id.* at 752. The Court reversed and remanded the case for retrial of the penalty phase.

*Austin* and *Hall* both are readily distinguishable from this case. Unlike the attorneys in *Austin* or *Hall*, Petitioner's trial counsel thoroughly investigated Petitioner's background and called sixteen penalty phase witnesses who testified about Petitioner's good character, kindness, good deeds, love for his son, and deep sorrow upon his son's death. *See* Dkt. No. 423 at 62-78. Trial counsel's failure to present witnesses explicitly asking the jury to spare Petitioner's life, while not supported by any evident strategic considerations, does not come close to the virtual abandonment of counsel's duty to present mitigating evidence shown in *Austin* and *Hall*.

Petitioner nonetheless argues the "likely damage [to Petitioner's case] is best understood by taking the word of the prosecutor," *Kyles*, 514 U.S. at 444, and points to the prosecutor's closing argument that "not one, not one [witness] asked that [Petitioner's] life be spared. Not one had the nerve." *See* RT 4266. In response, Respondent observes that "[i]t is exceedingly unlikely that any juror could have come to believe that [Petitioner's] own friends and mother did not hope and believe that his life should be spared." *See* Dkt. No. 429 at 10. As noted previously, this Court agrees that the jury reasonably could have inferred that at least some of Petitioner's friends and family wanted Petitioner to live. Petitioner's friend, Ted Grish, testified that he would "love

13

to go out there and [bowl] another six games with [Petitioner] at Moonlight Lanes." *See* RT 4136. Petitioner's mother, who lived with Petitioner at the time of the crimes, testified lovingly about Petitioner's life using a photo album she compiled. *See* RT 4206-4227. Another friend, Harry Strum, testified that Petitioner "enriched" his life. *See* RT 4143. Moreover, five other witnesses referred to Petitioner as their "friend" or "good friend" and spoke warmly about him, *see* RT 4113 (Eric Steinhauff), RT 4121 (Enoch Cole), RT 4161 (James Hall), RT 4173 (Robert Webb), RT 4199 (Barbara Thorn).

Notwithstanding the prosecutor's dismissive comment during closing argument, the California Supreme Court reasonably could conclude that the testimony at issue here would not have been reasonably likely to change the result of the proceeding. *See Strickland*, 466 U.S. at 694. Viewed in context, Mr. Grish's testimony, which trial counsel referred to in his closing, was at odds with the prosecutor's characterization. While having additional witnesses ask the jury expressly to spare Petitioner's life obviously would not have harmed Petitioner's mitigation presentation, the additional mitigating value of the such testimony is questionable in the context of nature and quantity of the other favorable testimony about Petitioner that counsel did present at the penalty phase.

As noted earlier, the prosecution's penalty phase presentation consisted entirely of the testimony of Detective Caro—who testified that he found the various items related to Petitioner's alleged plan to drown the Erberts—and spanned only five pages of the transcript of the penalty phase. *See* RT 4092-97. While the prosecutor touched briefly on the lack of explicit testimony asking the jury to spare Petitioner's life, her argument was focused almost entirely on the horrific circumstances surrounding the killings, including Deanna Erbert's presence in the home when Petitioner committed the crimes, the fact that Ms. Erbert's baby died "never having been held by a parent," RT 4247, the number of times Petitioner stabbed Ms. Erbert, RT 4254, and Petitioner's

14

subsequent lies to law enforcement about his involvement in the killings, RT 4265. Petitioner's penalty phase presentation spanned sixteen witnesses and 123 pages of transcript. It included testimony about various aspects of Petitioner's life, his good character and good deeds, and his struggles after his son died. *See* RT 4098-40221. It also included the testimony of numerous witnesses whose testimony at least suggested a desire that Petitioner's life be spared.

Despite this disparity between the prosecution's minimal presentation and Petitioner's substantial effort to show mitigation, the jury returned a unanimous vote for the death penalty after only four hours of deliberation and having asked no questions. *See* RT 4297-4303. One may draw at least a reasonable inference from the record that the jury sentenced Petitioner to death almost exclusively because of the aggravated facts of this case, and that its decision was not a close one. *See, e.g., Mickey v. Ayers*, 606 F.3d 1223, 1245-46 (9th Cir. 2010) ("The State's near-exclusive reliance on the facts of the crime at the penalty phase strengthens our conclusion that there is not a 'reasonable probability' that the outcome would have been different had [the petitioner] presented a different mitigation case). Given that the proffered evidence would not have substantially changed the overall thrust of Petitioner's penalty phase presentation, this Court cannot conclude that Petitioner has shown a "reasonable probability" that the result of his penalty trial would have been different or that the California Supreme Court applied the law unreasonably in rejecting this claim. *See Strickland*, 466 U.S. at 694.

### 4. Evidentiary Hearing

Petitioner has requested an evidentiary hearing as to Claim 18.B.7. *See* Pet. Br. at 17. While it earlier granted that request, finding that there was a "triable issue of fact as to whether the deficiency in counsel's performance [alleged in Claim 18.B.7] prejudiced Petitioner," *see* Dkt. No. 240 at 14-15, the Court notified counsel following the evidentiary hearing on Petitioner's mental-health claims that it was inclined to reconsider that decision, and it invited briefing. *See*

15

Dkt. No. 390 at 393-394; Dkt. No. 423 at 78. Respondent now has clarified he does not dispute that the proffered witnesses would have asked the jury to spare Petitioner's life, and accordingly there no longer is a dispute as to any material issue of fact. *See* Resp. Br. at 13 (waiving cross-examination of witnesses for purposes of Claim 18.B.7). Petitioner has already introduced—and the Court has considered—the expert testimony of Mr. Nolan, who opined that the Petitioner's trial counsel was deficient in failing to present the proffered testimony. *See* Dkt. No. 299-5 at 26. As Petitioner has not identified any other material issues of fact requiring an evidentiary hearing, the Court concludes that such a hearing no longer is appropriate.

### 5. Conclusion

Claim 18.B.7 will be DENIED. Petitioner's request for an evidentiary hearing as to this claim also will be DENIED.

### C. Lethal Injection

In Claim 23, Petitioner asserts that his death sentence is illegal and unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because lethal injection, the method by which California proposes to execute him, violates the constitutional prohibition against cruel and unusual punishment. *See* Fed. Pet. at 197. Respondent points out correctly that no Supreme Court decision has held that execution by lethal injection is cruel and unusual. *See* Dkt. No. 162 ("Answer"), at 85. Despite the Court's earlier order directing the parties to do so, neither party has submitted further briefing on this claim. *See* Dkt. No. 423 at 78-79.

To the extent that Petitioner argues that execution by lethal injection is unconstitutional generally, *see* Fed. Pet. at 205-06, that argument has been foreclosed by the Supreme Court. which concluded in 2008 that absent specific issues in its implementation, execution by lethal injection is constitutional. *See Baze v. Rees*, 553 U.S. 35, 48-49 (2008). Moreover, to the extent that Petitioner challenges the lethal injection protocol in place in California at the time he filed his

16

petition, his claim is moot given California's recent adoption of a new lethal injection protocol. Because Petitioner does not challenge the lethal injection protocol now in place, Claim 23 will be DENIED, without prejudice to Petitioner's right to challenge the new lethal injection protocol, if and when such a challenge is timely and appropriate. The Court expresses "no opinion as to whether this should be by way of habeas relief or through an action under 42 U.S.C. § 1983." *Payton v. Cullen*, 658 F.3d 890, 893 n.2 (9th Cir. 2011).

### D. Cumulative Error

In Claim 25, Petitioner alleges that cumulative constitutional error requires a reversal of his convictions and death sentence. *See* Fed. Pet. at 210. Respondent argues there are no errors to accumulate. *See* Resp. Br. at 14.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors still may prejudice a defendant to a point that the defendant's conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). To warrant relief, a petitioner must show the cumulative error had a "substantial and injurious effect or influence" on the result. *Brecht*, 507 U.S. at 637. Cumulative error is more likely to be found prejudicial when the government's case is weak. *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal).

Despite vigorous litigation, the Court has identified only two errors in the course of these federal habeas proceedings.[3] In a previous order with respect to Claim 5.C.1, the Court concluded

---

[3] Petitioner argues the Court should also should consider the cumulative prejudice from errors identified in Claim 18.B.1. *See* Pet. Br. at 21. The Court previously ruled that Petitioner failed to

17

that trial counsel was ineffective when "counsel's carelessness and indifference to Petitioner's cause resulted in the activation of the sounds of falling bombs emanating from a 'Terminator' toy in counsel's pocket at the time the jury was being shown autopsy photos of Ms. Erbert and her fetus" during guilt phase closing arguments. *See* Dkt. No. 240 at 11. In the instant order with respect to Claim 18.B, the Court concluded that counsel was ineffective during the penalty phase when he failed to elicit explicit testimony from five witnesses who would have asked the jury explicitly to spare Petitioner's life. *See supra* at p. 11. The Court also has concluded that neither of these instances of ineffective assistance taken by itself was prejudicial to Petitioner. *See* Dkt. No. 240 at 11; *supra* at pp. 11-15. While both errors were unfortunate, neither meets *Strickland*'s high bar of having been "so serious as to deprive [Petitioner] of a fair trial." *See Strickland*, 644 U.S. at 687

The Court also concludes that Petitioner has failed to show prejudice from cumulative error. Petitioner has not explained how the error identified in Claim 5.C.1 could have affected the penalty phase, or conversely, how the error identified in Claim 18.B.7 could have had any bearing on the guilt phase. This simply is not one of the exceedingly rare cases in which the cumulative effect of Petitioner's trial errors so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Cf. Thomas v. Hubbard*, 273 F.3d 1164, 1179-81 (9th Cir. 2001) (reversing conviction based on multiple errors severely encroaching on petitioner's ability to dispute whether he committed the crime). Petitioner has therefore not shown that the cumulative effect of the errors had a "substantial and injurious effect or influence" on the jury's

---

show ineffective assistance of counsel as to his allegation that counsel "failed to present a critical mass of evidence" in mitigation. *See* Dkt. No. 240 at 13. To the extent Petitioner relies on the mental-health evidence allegations in Claim 18.B.1, those allegations were subsumed by Claim 17, which has also been denied on the merits. *See* Dkt. No. 423. Accordingly, there is no error in Claim 18.B.1 to accumulate.

18

determinations, *Brecht*, 507 U.S. at 637, or that the California Supreme Court's denial of this claim was objectively unreasonable. This Court also would deny Claim 25 on the merits on *de novo* review.

Claim 25 will be DENIED. Because Petitioner has identified no remaining issues of material fact and makes only a conclusory assertion that an evidentiary hearing is necessary to determine prejudice, *see* Pet. Reply Br. at 26-27, the Court no longer sees a need for an evidentiary hearing as to this claim. An evidentiary hearing need not be granted when a petitioner's factual allegations are "insubstantial." *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007). Accordingly, Petitioner's request for an evidentiary hearing on Claim 25 also will be DENIED.

## III. CERTIFICATE OF APPEALABILITY

28 U.S.C. § 2253 provides for a "certificate of appealability" ("COA") for § 2254 cases under the following circumstances:

> (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
> 
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> 
> (B) the final order in a proceeding under section 2255.
> 
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
> 
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c).

"Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy under § 2253 is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller–El v. Cockrell*, 537 U.S.

19

322, 338 (2003) ("[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that Petitioner will not prevail").

Given the "relatively low" threshold for granting a certificate of appealability, *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir.2002), the Court concludes that in light of the relevant circuit authority, a COA is appropriate as to Claims 17 (ineffective assistance of counsel at the penalty phase for failure to discover and present certain mental health evidence), 18.B.1 (ineffective assistance of counsel at the penalty phase for general failure to present mitigating evidence), and 25 (cumulative error resulting in a violation of the constitutional right to due process and a fair trial).[4]

## IV. DISPOSITION

Good cause therefor appearing, Claims 18.B.7 and 25 are DENIED on the merits, Claim 23 is DENIED without prejudice to a future challenge to Petitioner's proposed execution by lethal injection, and Petitioner's request for an evidentiary hearing on the above-mentioned claims is DENIED. This Order disposes of all remaining claims; a judgment denying the Petition will be entered accordingly. A COA is GRANTED as to Claims 17, 18.B.1, and 25.

**IT IS SO ORDERED**

DATED: August 17, 2018

_____
JEREMY FOGEL
UNITED STATES DISTRICT JUDGE

---

[4] The Court has considered carefully whether to grant a Certificate of Appeal as to Claim 3, which asserts that trial counsel was ineffective in failing to enter a plea of not guilty by reason of insanity. Based on the expert testimony at the 2014 evidentiary hearing and as discussed at length by the Court in Docket No. 423, the record suggests strongly that such a plea would have been futile and that counsel's decision not to enter such a plea was well within professional standards. *See* Dkt. No. 423 at 46-47.